The STATE of Ohio, Appellee,

v.

DONKERS, Appellant.

[Cite as *State v. Donkers,* 170 Ohio App.3d 509, 2007-Ohio-1557.]

Court of Appeals of Ohio,
Eleventh District, Portage County.

Nos. 2003 P 0135 and 2003 P 0136.

Decided March 30, 2007.

512

514

516

Victor Vigluicci, Portage County Prosecuting Attorney, and Pamela Holder, Assistant Prosecuting Attorney, for appellee.

Neil Wilson and Catherine Donkers, pro se, for appellant.

VUKOVICH, Judge.

{¶ 1} Defendant-appellant Catherine Donkers appeals from the judgment of the Portage County Municipal Court, Ravenna Division, finding her guilty of driving without a valid license, failure to use a child-restraint system, and failure to comply with an order or signal of a police officer by fleeing or eluding. On appeal, she raises a great many allegations, including the lack of dialogue at her initial appearances, ineffective assistance of counsel, denial of the right to counsel, speedy trial, suppression, insufficient discovery and bill of particulars, tainted trial atmosphere, judicial bias, coverture and freedom of religion, sufficiency of the evidence, weight of the evidence, and consideration of prior arrests in sentencing.

{¶ 2} For the following reasons, appellant's child-restraint conviction is reversed with prejudice due to insufficient evidence on the element requiring that the subject vehicle be registered in the state of Ohio. Appellant's driving-without-a-valid-license charge is modified from a first-degree misdemeanor to a minor misdemeanor due to insufficient evidence that her license had been expired for more than six months. This minor-misdemeanor driving-without-a-valid-license charge and the failure-to-comply charge are reversed and the cause is remanded for a new initial appearance that provides proper discourse on appellant's rights.

## STATEMENT OF FACTS

{¶ 3} On May 8, 2003, a trucker driving on the Ohio Turnpike in Portage County called 911 to report a woman (appellant) driving with a baby lying in her lap. The Ohio State Highway Patrol dispatched the nearest trooper, who waited in a median crossover and clocked the described vehicle three times as it approached. The lowest speed clocked was 62 miles per hour, but the highest was said to be 68 in a 65-mile-per-hour zone. At the time, the trucker was surpassing the 55-mile-per-hour speed limit for trucks as he tailed behind appellant's vehicle flashing his lights, beeping his horn, and pointing to her car.

{¶ 4} The trooper testified that he viewed the baby in appellant's lap as she passed by his position. The trooper pulled behind appellant into the center of three lanes of traffic with the pursuit lights activated. Appellant moved into the right lane, kept her right turn signal activated, and slowed to 45 miles per hour. She was also seen pointing out of her window. Although the trooper used his lights, siren, air horn, and loudspeaker, appellant did not pull over.

{¶ 5} After traveling like this for three miles, appellant exited the turnpike and entered a line at a tollbooth. The trooper quickly approached the vehicle. He ordered appellant to turn off the vehicle and hand over her keys, which she did

only after multiple requests. She voluntarily explained that she had been breastfeeding her six-month-old child, which she urged was lawful based upon legal research she performed before making the trip. She stated that she did not pull over right away because she was looking for a safe, populated place. The trooper's sergeant appeared on the scene to assist.

{¶ 6} At first, appellant would not display identification or reveal her name. She cited United States Supreme Court case law dealing with lack of police authority to demand identification where no criminal investigation was occurring; however, she failed to recognize that although the trooper admitted that he was not conducting a criminal investigation, he was referring to crimes other than the traffic offenses which he believed she committed that day. Finally, she handed over an apparently homemade identification card/affidavit displaying her picture, her name, and a Pennsylvania address.

{¶ 7} In the meantime, the trooper ran the Michigan license plate on the vehicle and found it registered to appellant. He discovered problems with her Michigan driver's license that rendered her ineligible to drive. The trooper issued a traffic citation for driving without a valid license in violation of R.C. 4507.02(A)(1) and for failure to use a child-restraint device in violation of R.C. 4511.81, a minor misdemeanor. The citation also noted an accompanying criminal charge of obstructing official business. The police waited until the child's father, Brad Barnhill, could arrive to pick up the baby before officially arresting appellant. She was then sent to jail for processing and posted bond sometime later.

{¶ 8} The next morning, May 9, 2003, appellant appeared at her initial appearance before Municipal Court Judge Pittman. Appellant attempted to question the court regarding the case numbers, possibly because the court failed to advise her that she was charged with the child-restraint violation. The court interrupted her and asked if she had counsel, at which point it appears that appellant attempted to argue her right to lay counsel. The court threatened to charge appellant with disorderly conduct for presenting her arguments, entered a not-guilty plea on her behalf, and continued the case for a pretrial on June 9, 2003.

{¶ 9} Appellant and Mr. Barnhill (with whom she claims to have a common-law marriage under the laws of Pennsylvania) filed numerous pleadings. One of the main claims was that Mr. Barnhill should be substituted as the defendant because of the doctrine of coverture and their religious belief that he is the head of household who ordered her to commit the offenses. Another major point of contention surrounded the exception in Ohio's child-restraint law for nonresidents whose nonuse of the child restraint is in compliance with the law of their state of residence. Her motions pointed out that Michigan's child-restraint law has an

exception for a child who is being nursed. See Mich.Comp.Laws 257.710d (statute does not differentiate between driver and passenger or front seat and back seat or cars with airbags versus those without).

{¶ 10} On June 5, 2003, a criminal complaint was filed by the assistant prosecutor in the Portage County Municipal Court in Ravenna. The complaint charged appellant with two additional offenses arising out of the May 8, 2003 incident: failure to comply with an order or signal of a police officer in violation of R.C. 2921.331(B), which entails willfully fleeing or eluding; and child endangering in violation of R.C. 2919.22(A), which involves recklessly creating a substantial risk to the health or safety of a child by violating a duty of care, protection, or support. Both offenses are first-degree misdemeanors.

{¶ 11} On June 9, 2003, appellant appeared for the pretrial on the traffic citation. Her initial appearance on the new complaint was also held that day before Municipal Court Judge Martell. He entered a not-guilty plea on her behalf when she advised that she was without counsel, and he advised her how to receive appointed counsel. On June 12, the court set the trial on all charges for August 6, 2003.

{¶ 12} On July 11, 2003, the court appointed the Portage County Public Defender's Office to represent appellant. She apparently had moved from her Pennsylvania address without providing a change of address or making arrangements with her attorney to speak about the case. She finally met with counsel in the days preceding her trial and discovered that he would not agree to raise all the defenses she desired to present.

{¶ 13} On the morning of the August 6, 2003 trial, the court was advised that appellant refused appointed counsel's representation. Maintaining her coverture argument, appellant explained that she was representing her husband's interest and that she would be her husband's first choice of counsel. Before allowing appellant to proceed pro se, the court inquired into her understanding of the case and the situation. Counsel was then permitted to withdraw but ordered to remain as stand-by counsel.

{¶ 14} Before proceeding, the state dismissed the obstructing-official-business charge. (This was probably because the traffic ticket specified there were only two charges, obstructing is not a traffic offense, obstructing was listed as a criminal charge that would be filed later, and no later criminal charge was filed on that offense as the state charged her with fleeing and eluding instead.) The bench trial took two full days plus the morning of the third day for closing arguments. The trucker testified that he looked out of his driver's side window and saw a sleeping baby laying face down in appellant's lap with its head toward the driver's door. He did not see her nursing and noted that he would not have been able to see this since the baby's head was on her left side. The trooper

testified to the sequence of events leading up to her arrest, and the video from his dashboard camera was viewed. The sergeant also testified for the state.

{¶ 15} Mr. Barnhill testified for the defense that appellant has a residence in Livonia, Michigan, that is a condominium owned by a trust, with her same name, for which she was the trustee. Mr. Barnhill identified a gas bill for the residence in appellant's name and testified that appellant stays at the Michigan residence very often, approximately two times per month and often for extended stays. He also testified that he instructed appellant to nurse while driving to save time on the drive to Michigan; he explained that he had researched the law to determine the propriety of the action. He also disclosed that when appellant called him to inform him that she was being signaled to stop, he told appellant to proceed to the nearest toll booth before stopping. He explained that she must do exactly as he says and that he is the only public voice.

{¶ 16} Appellant then called herself as a witness. She explained that she maintains a legal residence in Michigan and a domicile in Pennsylvania. She advised that the baby was fussy so she stopped at the first rest area in Ohio to change the baby's diaper and feed her some rice cereal. The baby was still fussy so she placed a nursing pillow on her lap and allowed the baby to nurse. She then began driving again while the child nursed. She explained that the baby nurses for an hour and Mr. Barnhill instructed her that it would be legal to nurse on the way to save time. She opined that nursing was less distracting than listening to a screaming baby while driving. She explained that nursing her child does not require her hands to be off the steering wheel. She also mentioned that the child did not nurse the entire time because she often takes breaks and then latches on again on her own.

{¶ 17} As for her failure to immediately pull over, she stated that she had her cruise control set on 65 miles per hour and thus she did not think the trooper was after her at first. She also noted her concern with the tailing trucker. When she moved over to the right lane and the trooper followed, she realized he was signaling to her. She then called Mr. Barnhill on her cellular phone for instructions. She advised the court that she had been the victim of sexual assault twice in the past and the victim of assault by police officers. Thus, she claimed to fear being stopped without witnesses. She stated that she tried to use hand signals to tell the officer that she would stop at the next exit by pointing at each green exit sign they passed. She testified that she got in the tollbooth line due to construction in the berm and that she intended to pull over after paying at the booth.

{¶ 18} The court found appellant guilty of driving without a valid license, failure to use a child restraint, and failure to comply with an order or signal of a police officer by fleeing and eluding. The court acquitted appellant of the child-

endangering charge due to the fact that the child-restraint law states that such act shall not be used as a basis for criminal prosecution of another offense or as evidence of any other offense. R.C. 4511.81(D).

{¶ 19} A sentencing hearing was held on December 4, 2003. Thereafter, the court fined appellant $100 for the minor-misdemeanor child-restraint violation. For driving without a valid license, the court sentenced appellant to 180 days in jail with 90 days suspended and 90 days of house arrest, a $200 fine, and two years of supervised probation. For the charge of failure to comply with a police officer by fleeing and eluding, the court imposed this same sentence to run concurrently, required a mental-health evaluation, and ordered appellant to follow any counseling recommendations to assist her in dealing with authority figures.

{¶ 20} Appellant filed a timely notice of appeal in the Eleventh District Court of Appeals on December 31, 2003. Various problems delayed the progress of this appeal. For instance, there were issues concerning appellant's continued indigency, which were addressed after a hearing before an appellate court magistrate. Then, the appeal was dismissed for failure to prosecute. However, the appeal was reinstated in February 2006, and counsel was permitted to file a brief containing six main assignments of error with various subissues. Appellant was then permitted to file a pro se supplemental brief, which contains five supplemental assignments of error. Appellant then sought leave to file a second supplemental brief.

{¶ 21} A visiting panel from the Seventh District Court of Appeals was appointed to decide the appeal. This panel denied her request to file a second supplemental brief. The appeal is now before this court. Some assignments of error or parts thereof will be addressed together when they are sufficiently related.

## ASSIGNMENT OF ERROR NUMBER ONE AND SUPPLEMENTAL ASSIGNMENT NUMBER FOUR

{¶ 22} The first assignment of error briefed by counsel and the fourth supplemental assignment briefed by appellant pro se provide:

{¶ 23} "The trial court erred in failing to follow the required procedure upon the appellant's initial appearance by not fully advising her of the charges against her and of her rights."

{¶ 24} "The court erred to the prejudice of Catherine by denying to Catherine due process of law by failing to notify Catherine not only of her right to a jury at either arraignment, but that this right must be claimed or it would be deemed waived."

{¶ 25} Appellant urges that Crim.R. 5(A) was violated by the judges at both initial appearances. She cites both transcripts and points out that she was not informed of her right to counsel, her right to remain silent, her right to a jury trial, and the need to demand a jury to invoke that right. She also notes that at the May 9, 2003 initial appearance, the court never even mentioned the child-restraint charge.

{¶ 26} Crim.R. 5(A) provides the procedure upon initial appearance. When a defendant first appears before the judge, the judge shall permit the accused or his counsel to read the complaint and shall inform the defendant of the nature of the charge against him. Crim.R. 5(A)(1). The court shall also inform the defendant that he has a right to counsel or court-appointed counsel and the right to a reasonable continuance to secure counsel. Crim.R. 5(A)(2). The court must then inform the defendant that he need make no statement and that any statement made may be used against him. Crim.R. 5(A)(3). Finally, the court must inform the defendant of his right, where appropriate, to a jury trial and of the need to make a jury demand in a petty-offense case. Crim.R. 5(A)(5). The rule continues that in misdemeanor cases, the defendant may be called upon to plead at the initial appearance. Crim.R. 5(A). If the defendant enters a plea, the procedures in Crim.R. 10 and 11 become applicable. Id. Not guilty is one of the four available pleas. Crim.R. 11(A).

{¶ 27} Appellant was asked to plead, and a not-guilty plea was entered on her behalf as permitted in Crim.R. 11(A). Applying the above law to the facts herein, we must now view and apply Crim.R. 10 because a plea was entered at the initial appearance. See Crim.R. 5(A). Technically, Crim.R. 10 pertains to arraignments. It provides that the court shall read the complaint to the defendant or state the substance of the charge and call on him to plead to the complaint. Crim.R. 10(A). The defendant may, in open court, waive the reading of the complaint, and the defendant shall be given a copy of the complaint or shall acknowledge receipt of it before being asked to plead. Id.

{¶ 28} Crim.R. 10(C) is then entitled "explanation of rights" and provides that when a defendant who is not represented by counsel is brought before a court and called upon to plead, the judge shall cause him to be informed *and shall determine that he understands* the following: a right to retain counsel, a right to a reasonable continuance in the proceedings to secure counsel even if he intends to plead guilty, the right to court-appointed counsel, the right to bail, and the fact that he need make no statement at any point in the proceeding, but that any statement made can and may be used against him. If there are multiple defendants to be arraigned, the judge may by general announcement advise them of their rights as prescribed in the rule. Crim.R. 10(D).

{¶ 29} These rules apply to any criminal charges. But for the traffic offenses, the corresponding Traffic Rules apply. See Traf.R. 1(A) (apply Traffic Rules to traffic cases); Traf.R. 2(A) (traffic case is a proceeding involving violation of a law governing the operation and use of a vehicle). The first appearance in a traffic case is called the arraignment. See Traf.R. 8. See, also, 1975 Staff Note 1 to Traf.R. 8.

{¶ 30} Traf.R. 8 closely mirrors Crim.R. 10 and contains elements from Crim.R. 5 as well. See 1975 Staff Note 1 and 5 to Traf.R. 8. This rule provides that the arraignment shall be conducted in open court and shall consist of reading the complaint (traffic ticket) to the defendant, or stating to him the substance of the charge, and calling on him to plead to the complaint. Traf.R. 8(A). See, also, Traf.R. 3(A). The defendant shall be given a copy of the complaint, or shall acknowledge receipt thereof, before being called upon to plead and may in open court waive the reading of the complaint. Traf.R. 8(A).

{¶ 31} Similar to the Criminal Rules, the Traffic Rules also require an explanation of rights at the arraignment stage. Traf.R. 8(D). Specifically, before calling the defendant to plead, the judge shall cause him to be informed *and shall determine that defendant knows and understands* that he has a right to counsel or appointed counsel and the right to a reasonable continuance in the proceedings to secure counsel, that he has a right to bail, that he need make no statement at any point in the proceeding, but any statement made may be used against him, that he has, where such right exists, a right to jury trial which must be demanded in petty offenses, and that, if he is convicted, the conviction will become part of his driving record. Id. If there are multiple defendants to be arraigned, the judge may advise, or cause them to be advised, of their rights by general announcement. Traf.R. 8(E).

{¶ 32} The transcripts from both initial appearances are lacking a full discussion of the defendant's rights. The May 9, 2003 transcript shows that the court inquired into whether appellant will be represented by counsel. However, the court did not mention the right to counsel, the right to court-appointed counsel, or the right to a continuance to secure counsel. The court continued bail; thus, that right was covered. The court noted the right to a trial in general but did not advise of the right to a jury trial or the need to demand one to preserve that right. The court made no reference to the fact that appellant could remain silent and that all statements can be used against her. Finally, the court failed to note that appellant's driving record will be affected by any traffic infractions.

{¶ 33} At the June 9, 2003 appearance, the court continued bail and revealed the right to court-appointed counsel and the process for determining eligibility. Yet the court did not advise appellant of her right to a jury trial or the need to demand one in order to preserve that right. Furthermore, the court did not

warn appellant that all statements can be used against her or mention the right to remain silent.

{¶ 34} The state claims that these two municipal courts play a video to the defendants prior to beginning the individual appearances, which contains a recitation of the defendants' rights. Such procedure could be permissible to "inform" the defendant of her rights at arraignment. See Crim.R. 10(D); Traf.R. 8(E). However, there exist various problems here.

{¶ 35} First, we do not have the video or a transcript of its contents before us. Second, we do not know if appellant was present for the viewing. Third, we do not know if the defendants were specifically instructed to watch the video or if it was simply playing in the background. Fourth, informing the defendant of her rights by video is not sufficient to determine that the defendant knows and understands those rights. We shall proceed to discuss these issues further.

{¶ 36} In responding to various arguments appellant presented at sentencing similar to those raised in this assignment, Judge Martell stated that he is aware that Judge Pittman has a lengthy rights tape for initial appearances and opined that appellant viewed that video on May 9, 2003. Appellant answered, "Absolutely not." Judge Martell then inquired if she saw the video at the June 9, 2003 initial appearance before him. She stated that she did not pay attention as she was conferring with Mr. Barnhill about her surprise over the two new charges. She also explained that she did not know that she needed to listen before her case was called.

{¶ 37} The state contends that it is appellant's obligation to provide the appellate court with the video when submitting the transcript from the initial appearance. We note the following statements of the Ninth District relevant to this issue:

{¶ 38} "The state argues that the defendant has not produced a transcript of proceedings or a record of the arraignment. Counsel for the state further says that an explanation of a defendant's rights, or a record of the arraignment is generally done orally by the court, or at its direction, before each session of the court. While the defendant does have the burden of seeing that the record is complete, under the appellate rules, he can do no more than request the clerk to prepare and forward the transcript of docket and journal entries, and the transcript of proceedings.

{¶ 39} " * * * Here, the defendant requested and filed the transcripts, and the reviewing court can determine from such transcripts whether or not an error was committed. We must assume that those transcripts, as certified by the clerk and the trial judge, respectively, are complete and accurate." *State v. Boerst* (1973), 45 Ohio App.2d 240, 241–242, 74 O.O.2d 350, 343 N.E.2d 141.

{¶ 40} In the case before us, appellant ordered the entire transcript of the proceedings in her case from the dates of the initial appearances. The court reporter certified the submitted transcripts as true and correct. The transcripts of the initial appearances make no reference to a video and do not allude to any previous explanation of rights. If the state insists that there is more content that the court reporter failed to include and that is crucial to their position, the state could have used App.R. 9(E) to correct the record and to submit the video along with a certification that it was played at appellant's initial appearance so that we could judge its contents.

{¶ 41} Regardless, the existence of a complying video is irrelevant without proof that appellant was present for the playing of the video. Even if her statement at sentencing could be taken as proof that she was present for the playing of the June 9 video, this would not resolve the problem of the May 9 initial appearance. Additionally, assuming she was present for the presentation, there would also have to be proof that while she was present, there were orders or instructions given as to the need to watch the video.

{¶ 42} It is also important to point out that even if a complying video was played on both dates and if appellant can be confirmed as being present and if the importance of watching it was explained in her presence, a video or other en masse description of rights is merely that—*a description of the rights*. It does not satisfy the requirement that directs the court to determine that the defendant "understands" the rights listed in Crim.R. 10(C) or "understands and knows" the rights listed in Traf.R. 8(D). These provisions require an individualized inquiry.

{¶ 43} As appellant points out, the Eleventh District, whom we are representing here, was once presented with a case containing a similar issue. *State v. Bayer* (1995), 102 Ohio App.3d 172, 656 N.E.2d 1314. At the initial appearance, the defendant was merely asked if he had an attorney, and he responded in the negative. Id. at 180, 656 N.E.2d 1314. The defendant pleaded not guilty at his initial appearance, and he was later found guilty after a pro se trial. On appeal, he claimed among other things that the court violated Crim.R. 5 and 10 at his initial appearance.

{¶ 44} In response, the state claimed that the court gave a pamphlet to the defendants and read a standardized introduction defining the pleas and instructing the defendants to read the pamphlet. Id. at 179, 656 N.E.2d 1314. The state submitted on appeal an affidavit of the bailiff stating that he gave the defendant a copy of the pamphlet and that the defendant was present for the court's standard, general introduction. Id. at 179–180, 656 N.E.2d 1314, fn. 8–9. Attached to the bailiff's affidavit was the court's general introduction to all defendants, which was not part of the transcript. Id. at 180, 656 N.E.2d 1314, fn. 9.

{¶ 45} The Eleventh District concluded in *Bayer* that a one-sided rights colloquy to all defendants does not provide the discourse required by the rules concerning initial appearances to ensure comprehension of the rights. Id. at 180, 656 N.E.2d 1314. Similarly, Staff Note 3 to Traf.R. 8 provides:

{¶ 46} "Although the nature of the available pleas may be given in a general instruction to all defendants, Traf.R. 8(E), the establishment of the understanding of the charge is a personal matter and the judge must conduct this aspect of the arraignment with each defendant individually."

{¶ 47} As set forth above, no listed rights were discussed at the May 9 initial appearance besides bail. Furthermore, there was no determination that appellant understood the right to counsel or court-appointed counsel, the right to a continuance to secure counsel, the right to a jury trial, the need to demand a jury trial, the right to remain silent, the caveat that anything she says can be used against her, and the fact that traffic violations will be reported on her driving record. Contrary to the state's position at oral argument, alluding to the right to a trial does not satisfy the obligation to state the right to a *jury* trial or the need to demand a jury trial, and even if it did, it does not ensure an understanding.

{¶ 48} Then, at the June 9 initial appearance on other charges, a different judge discussed only court-appointed counsel and bail. There was no discussion of the right to a jury trial or the need to demand a jury in order to preserve that right. Nor was there a determination that appellant understood the right to remain silent and the caveat that anything she says can be used against her.

{¶ 49} Thus, neither court reviewed the full list of rights. Nor did either court even generally ask if appellant understood the rights previously discussed in the alleged video. These are clear violations of Crim.R. 5 and 10 and Traf.R. 8. These violations are especially significant considering the following facts that exist in this case: appellant was tried without a jury as no jury was demanded, counsel was not appointed until over two months from the May 9 initial appearance and over one month from the June 9 initial appearance, this appointment was less than one month from the scheduled trial date, appellant ended up representing herself (with a host of media and cameras pointing at her from the jury box), and she made multiple incriminating statements in pretrial filings and at trial from the stand and during arguments. Each of these facts is related to a right that should have been discussed and understood at the initial appearance.

{¶ 50} Moreover, an explanation of the nature of charges obviously cannot be given en masse since that is an individualized matter. At the May 9, 2003 initial appearance, the court advised, "You are charged with Obstructing Official Business, a second degree misdemeanor, as well as Driving without a Driver's License." The state dismissed the obstructing charge, so the sufficiency of the

initial appearance with regard to that charge is not at issue here. The most glaring problem regarding this recitation of the charges is that the court did not even advise appellant of the existence of the child-restraint charge. Thus, appellant was certainly not advised of the substance of that charge as required by Traf.R. 8(B).

{¶ 51} Further, there is no indication on the record that appellant was given a copy of the complaint, or acknowledged receipt thereof, before being called upon to plead (or waive the reading) as is specifically required by Traf.R. 8(B). See, also, Crim.R. 5(A) and 10(A). This failure, combined with the lack of a recorded advisement of rights and the failure to individually determine an understanding of those rights in a case where appellant made multiple incriminating statements and represented herself in a bench trial due to the failure to file a jury demand, is cause for reversal.

{¶ 52} At the June 9, 2003 initial appearance, the court advised that appellant was charged with failure to comply with an order or signal of a police officer. The court disclosed that the offense was a first-degree misdemeanor that carried a potential of six months in jail and a $1,000 fine plus costs. (We note that appellant was acquitted of the child-endangering charge. Thus, the sufficiency of that initial appearance is not before us.) There is no specific allegation here that the court's statement failed to comply with the requirement in Crim.R. 5(A)(1) that the court inform the defendant of the nature of the charges and the requirement in Crim.R. 10(A) that the court explain the substance of the charges. However, there is no indication that appellant was given a copy of the complaint, or acknowledged receipt thereof, before being called upon to plead as required by Crim.R. 10(A). The failure to ensure receipt of the complaint at the June 9, 2003 initial appearance, when combined with the even more important lack of a recorded and submitted advisement of rights and the failure to ensure that appellant understood certain rights as analyzed above, is cause for reversal.

{¶ 53} Finally, we note the state's argument that the failure to discuss the right to counsel or appointed counsel at the May 9 initial appearance is irrelevant because a not-guilty plea was entered. Likewise, the state contends that the failure to mention the right to remain silent and the fact that all statements can be used against her is irrelevant because she did not incriminate herself at either initial appearance. These arguments miss the point of the requirement that the defendant must be told and determined to understand her rights. The point is not just to protect her at the initial appearance, but to protect her throughout the proceedings. The state's contention that she failed to note the lack of a jury when she appeared for trial is similarly misguided. This could very well be because she still did not know that she had the right to a jury trial.

{¶ 54} For all of the foregoing reasons, this assignment of error has merit. Accordingly, appellant's convictions must be reversed and remanded for further proceedings starting with the initial appearance.

{¶ 55} However, not all charges can be retried upon our remand due to the sufficiency issues discussed next. That is, when evidence is insufficient to support an offense, such matter cannot be ignored merely because the appellate court is remanding for retrial on other grounds. The state is never permitted a second chance at providing sufficient evidence of an offense where the state originally presented insufficient evidence. See *State v. Lovejoy* (1997), 79 Ohio St.3d 440, 450, 683 N.E.2d 1112; *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (double jeopardy bars retrial if appellate court finds insufficient evidence). Unlike certain other issues discussed below, sufficiency is not moot when it to comes the above-ordered remand. See id. See, also, *State v. Alexander*, Carroll App. No. 03CA789, 2004-Ohio-5525, 2004 WL 2340039, ¶ 36; *State v. Larsen* (June 26, 1997), Franklin App. No. 96APA10–1401, 1997 WL 360846.

## ASSIGNMENT OF ERROR NUMBER FIVE

{¶ 56} Due to the effect a finding of insufficient evidence will have on the charges available for retrial, we shall now discuss appellate counsel's fifth assignment of error, which alleges:

{¶ 57} "The trial court erred in denying the motion of the defendant appellant at the conclusion of the state's case to dismiss each of three counts, operating a motor vehicle without a license, failure to comply and child restraint."

{¶ 58} Here, appellant raises issues surrounding her motion for acquittal, general sufficiency of the evidence, and manifest weight of the evidence. Appellant filed a motion for acquittal at the end of the state's case and at the close of all evidence.

{¶ 59} An appellate court reviews a denial of a Crim.R. 29 motion for acquittal utilizing the same standard used to review a sufficiency-of-the-evidence claim. *State v. Carter* (1995), 72 Ohio St.3d 545, 553, 651 N.E.2d 965. Sufficiency is a question of law dealing with adequacy of the evidence. *Thompkins*, 78 Ohio St.3d at 386, 678 N.E.2d 541. In evaluating the sufficiency of the evidence, we view the evidence in the light most favorable to the state and determine whether reasonable minds can reach different conclusions as to whether each element has been proven beyond a reasonable doubt. *State v. Goff* (1998), 82 Ohio St.3d 123, 128, 694 N.E.2d 916.

{¶ 60} Even if the evidence is legally sufficient to sustain the conviction, the conviction may be against the manifest weight of the evidence. *Thompkins*, 78

Ohio St.3d at 387, 678 N.E.2d 541. Weight and sufficiency are distinct concepts, and different tests apply to each concept. Id. at 386–387, 678 N.E.2d 541. Weight of the evidence concerns the effect of the evidence in inducing belief. Id. at 387, 678 N.E.2d 541. In conducting a weight-of-the-evidence review, the court of appeals must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Id.

{¶ 61} The fact-finder, in this case the trial judge, occupies the best position to observe the demeanor, gestures, and voice inflection of the witnesses. *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 461 N.E.2d 1273. Because credibility of the witnesses and weight of the evidence are questions primarily within the province of the fact-finder, a verdict is reversed on manifest-weight-of-the-evidence grounds only in exceptional circumstances where the evidence weighs heavily against the conviction. See *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541; *State v. DeHass* (1967), 10 Ohio St.2d 230, 231, 39 O.O.2d 366, 227 N.E.2d 212.

{¶ 62} First, we shall address the child-restraint charge. The child-restraint law is contained in R.C. 4511.81, which provides:

{¶ 63} "(A) When any child who is in either or both of the following categories is being transported in a motor vehicle, other than a taxicab or public safety vehicle as defined in section 4511.01 of the Revised Code, that is registered in this state and is required by the United States department of transportation to be equipped with seat belts at the time of manufacture or assembly, the operator of the motor vehicle shall have the child properly secured in accordance with the manufacturer's instructions in a child restraint system that meets federal motor vehicle safety standards:

{¶ 64} "(1) A child who is less than four years of age;

{¶ 65} "(2) A child who weighs less than forty pounds."

{¶ 66} "(B) [requires the same child-restraint use in vehicle registered in this state that is operated by a nursery school, kindergarten, or daycare]

{¶ 67} * * *

{¶ 68} "(F) If a person who is not a resident of this state is charged with a violation of division (A) or (B) of this section and does not prove to the court, by a preponderance of the evidence, that the person's use or nonuse of a child restraint system was in accordance with the law of the state of which the person

is a resident, the court shall impose the fine levied by division (H)(2) of section 4511.99 of the Revised Code."[1]

{¶ 69} Appellant's claim on appeal revolves around her contention that Ohio's car-seat exception applies to her. That is, R.C. 4511.81(F) provides a defense to nonresidents of Ohio if they prove by a preponderance of the evidence that their nonuse of the car seat was in accordance with the law of the state of their residence. Much dispute at trial centered on whether appellant was a Michigan resident or a Pennsylvania resident, where she maintained a domicile with Mr. Barnhill. This is because as stipulated by the state, Mich.Comp.Laws 257.710d specifically provides an exception to the child-restraint law for children who are being nursed. Notably, that Michigan nursing exception does not distinguish between drivers and passengers, front and back seat, or cars with and without airbags.

{¶ 70} Appellant testified that she is a Michigan resident. She was born and raised in Michigan. She graduated from the University of Michigan. Her car is registered in Michigan. Her suspended driver's license is from Michigan. A trust of which she is the beneficiary and trustee owns a condominium in Michigan. She considers this address her legal residence. She testified that she stays there a couple times a month for multiple days at a time. She presented alternative arguments that she had two residences or that Pennsylvania was merely her domicile and Michigan was her residence.

{¶ 71} Besides disputing her residency, the state tried to avoid this issue by arguing that the baby was not continuously nursing. For instance, it argued without support that a baby would not nurse for 40 minutes. At oral argument, the state pointed to appellant's testimony that the baby was not nursing the entire time, referring to the baby's latching on and off during a feed. Likewise, the trial court avoided the residency element of her defense by deciding that she was not in fact nursing. Thus, the court found that she could not invoke Ohio's exception because she was not complying with Michigan law. However, before this court can reach the sufficiency of appellant's defense, we must review the sufficiency of the state's evidence on the elements of the child-restraint offense. This is because the state must meet its burden on the elements before a defendant has the burden to present an affirmative defense. See R.C. 2901.05(A).

---

1. This is how division (F) read at the time of appellant's offense and trial. On January 1, 2004, the end of division (F) was changed to refer to division (H)(2) of "this section" (rather than section R.C. 4511.99) to determine the punishment. 2002 S.B. 123. The amendment would not change the analysis of the issues herein.

{¶ 72} There is a glaring problem here. That is, R.C. 4511.81(A) only applies when the qualifying child is being transported in a motor vehicle *that is registered in this state*. The exception in division (F) need only be utilized by a nonresident who was properly charged with committing a violation of division (A). If the car in which the child was transported was not registered in Ohio, division (A) was not violated, and thus the nonresident exception does not come into play.

{¶ 73} Contrary to the state's assumption, the existence of a nonresident exception does not create a violation. The violations are contained in divisions (A) and (B). Division (F) is clearly a defense to any violations. If the elements in division (A) are not satisfied, then the defense is irrelevant and unnecessary. In other words, if the government fails to meet its burden of proving the essential elements, then the defendant's burden to prove an affirmative defense never arises. See R.C. 2901.05(A).

{¶ 74} We also point out that the element in division (A) requiring the vehicle to be registered in this state has nothing to do with residency. Thus, under the statute's plain terms even an Ohio resident does not violate the child-restraint law if he is operating a vehicle that is not registered in Ohio.

{¶ 75} We also note that there is no valid argument that the phrase "registered in this state" refers only to taxicabs and public-safety vehicles. Placement of commas around taxicabs and public safety vehicles in the context of the sentence clearly establishes that the taxi and safety-vehicle exception is an intruding clause that stands alone.

{¶ 76} When there is plain and clear statutory language, it must be applied without further interpretation. *State ex. rel Plain Dealer Publishing Co. v. Cleveland,* 106 Ohio St.3d 70, 2005-Ohio-3807, 831 N.E.2d 987, ¶ 38. Legislative intent is first and foremost expressed through the plain language of the statute; no further source shall be consulted if there is unambiguous language. Id. Where the language lacks ambiguity, the court must apply, not construe, the law. Id. This statute contains plain language.

{¶ 77} The state argued that this plain-language reading of the statute would be nonsensical as division (F) would have no meaning. However, this is untrue. The defense in division (F) is available for use by a nonresident who is pulled over while operating a vehicle registered in Ohio. That situation would arise if a nonresident was driving a rental car registered in this state. That situation would also arise if a nonresident was visiting friends of family, for instance, and driving a borrowed car that was registered in Ohio. Those visiting residents can be ticketed for violating Ohio's car seat law if they drive Ohio vehicles, but they can assert the division (F) defense at trial.

{¶ 78} Whether it was the legislature's actual intent to exclude from the child-restraint law all children riding in vehicles not registered in Ohio is unknown and irrelevant since the statute's plain language requires the subject child to be riding in a vehicle registered in this state. We also note that statutes defining criminal offenses must be strictly construed against the state and liberally in favor of the accused. *State v. Jordan* (2000), 89 Ohio St.3d 488, 492, 733 N.E.2d 601, citing R.C. 2901.04(A).

{¶ 79} In conclusion, the legislature expressed that an essential element to a child-restraint violation is that the vehicle transporting the child is registered in Ohio. R.C. 4511.81(A) and (B). In this case, the state failed to prove this essential element. In fact, the state set forth affirmative evidence that the car was registered in Michigan. Because there is insufficient evidence of a violation of R.C. 4511.81(A), appellant's child-restraint conviction is reversed with prejudice. See *Lovejoy*, 79 Ohio St.3d at 450, 683 N.E.2d 1112; *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541 (double jeopardy bars retrial if appellate court finds insufficient evidence).[2]

{¶ 80} As to the charge of driving without a valid license, appellant contends here and under her pro se second supplemental assignment of error that there was insufficient evidence to support the degree of the offense with which she was convicted. She contends that her conviction and sentence for driving without a valid license should have been a minor misdemeanor rather than a first-degree misdemeanor. In support, she states that there was no evidence that her license had been expired for more than six months at the time of the incident; she also notes that she had no prior convictions for driving without a license or driving under suspension. The state's brief makes no argument regarding this issue.

{¶ 81} However, appellant was charged with violating the following statute: "No person * * * shall operate any motor vehicle upon a highway * * * unless

---

2. {¶ a} We realize that appellant does not specifically raise the failure of proof on the element of the vehicle's registration status. Nevertheless, she has asked us to review the sufficiency and the weight of the evidence regarding her child-restraint charge. We cannot do a sufficiency review of the child-restraint conviction without recognizing and reviewing all of the essential elements. In setting forth the elements in order to conduct that sufficiency review, the problem regarding the state of the vehicle's registration cannot be overlooked. Because she raises sufficiency of the evidence, we need not utilize a plain-error review, but even if we did, the error must be noticed.

{¶ b} Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court. Crim.R. 52(B). Plain-error analysis requires an inquiry into whether, but for the error, the outcome of the trial would have been different. *State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 357, 662 N.E.2d 311. The error here is too glaring to overlook in reviewing the sufficiency of the evidence and is outcome-determinative. Hence, it is clearly a plain error or defect that affects appellant's substantial rights.

the person has a valid driver's license issued under this chapter." R.C. 4507.02(A)(1). See, also, R.C. 4507.04 (applying this chapter to nonresidents). At the time, the penalties for driving without a valid license were provided in R.C. 4507.99. Specifically, this statute provided:

{¶ 82} "(D) Whoever violates division (A)(1) or (3) of section 4507.02 of the Revised Code by operating a motor vehicle when the offender's driver's or commercial driver's license has been expired for no more than six months is guilty of a minor misdemeanor. * * *

{¶ 83} "* * *

{¶ 84} "(H) Except as provided in divisions (A) to (E) of this section and unless another penalty is provided by the laws of this state, whoever violates any provision of sections 4507.01 to 4507.081 or 4507.10 to 4507.37 of the Revised Code is guilty of a misdemeanor of the first degree." (See www.legislature.state.oh.us for this version of the statute effective until Jan. 1, 2004, when the 124th General Assembly passed 2002 S.B. 123 to renumber the sections and also to add new degrees where the offender has prior convictions of driving without a valid license.)

{¶ 85} Thus, the state had to prove and the court had to find that appellant's license had been expired for more than six months in order to convict her of a first-degree misdemeanor and impose the penalties relative to that degree. See *State v. Gordon* (1971), 28 Ohio St.2d 45, 48, 57 O.O.2d 180, 276 N.E.2d 243 (state must prove degree enhancements beyond a reasonable doubt). If the state fails to prove that appellant's license was expired for more than six months, then only a minor misdemeanor could be listed as the convicted crime with its maximum fine of $150 and no jail time. See R.C. 2929.28(A)(2)(a)(v). See, also, R.C. 2929.21 (Legislative Service Commission penalty table). A first-degree misdemeanor carries a maximum jail term of 180 days and a maximum fine of $1,000. R.C. 2929.24(A)(1); R.C. 2929.28(A)(2)(a)(i). As aforementioned, the court here convicted appellant of first-degree-misdemeanor driving without a valid license. On this charge, the court sentenced her to the maximum jail time for a first-degree misdemeanor of 180 days, with 90 days suspended and 90 days of electronically monitored house arrest, and the court imposed two years of supervised probation. The court also imposed a $200 fine.

{¶ 86} We also note that the traffic ticket did not specify the degree of the offense and did not mark the preprinted blanks asking whether the license had been expired for more than six months or for six months or less. As set forth in assignment of error number one regarding the initial appearance, the court did not mention the degree of the offense, the possible penalties, or any allegations as to how long her license had been expired. As set forth in assignment of error number four, the bill of particulars provided by the state merely provided that

she drove without a valid license and that the offense is a first-degree misdemeanor. It did not provide that the reason it was a first-degree misdemeanor was because of allegations that her license had been expired for more than six months.

{¶ 87} Most important, when the trooper testified, he merely stated with regard to this issue that the status of appellant's license is expired. He was not asked and did not give any indication of how long her license had been expired. The state presented no evidence that appellant's license had been expired for more than six months. Thus, although there is sufficient evidence of an expired license, there is insufficient evidence to support the penalty-enhancing element of being expired for more than six months.

{¶ 88} At trial, the state focused on license suspensions. At oral argument, the state responded to this issue by pointing to appellant's suspension. However, appellant was only charged with driving without a valid license under R.C. 4507.02(A)(1). She was not charged with driving under a suspended license. In fact, in closing arguments, the trial court warned the state to stop speaking about a crime (driving under suspension) with which appellant was not charged.[3] The state responded to the court's warning by opining that appellant's license was not valid both because it was expired and because it was suspended. However, the statute differentiates between the two categories. Furthermore, we have previously held that a person does not commit the offense of driving without a valid license by driving under suspension. *State v. Logue* (Feb. 11, 2000), Belmont App. No. 97BA46, 2000 WL 179765 (suspension does not make a license invalid). See, also, *State v. Gilbo* (1994), 96 Ohio App.3d 332, 337–338, 645 N.E.2d 69. Rather, driving without a valid license refers to those who have never had a license or those who have an expired license. See id. Thus, the state's response is invalid.

{¶ 89} Due to the insufficiency of the evidence on a license that has been expired more than six months, appellant's conviction and sentence can only reflect a minor misdemeanor. Thus, appellant's conviction for first-degree misdemeanor driving without a valid license is modified to a conviction for minor-misdemeanor driving without a valid license. See R.C. 2945.79(D) (where insufficient evidence

---

3. The state elicited testimony from the trooper that on May 8, 2003, appellant had been driving under three suspensions. However, this is incorrect. The third claimed example of a suspension specifically states that it went into effect on May 18, 2003. This is after appellant's May 8, 2003 traffic stop. Additionally, we note that the first two examples of suspensions arose from the same Pennsylvania traffic ticket and were imposed on the same date, June 12, 2001, as a result of her failure to answer for the ticketed offenses of speeding and failure to show proof of insurance. Thus, she may have been driving under one suspension. Still, we note that although the driving record introduced as a state's exhibit shows the prior existence of a suspension, the main caption of the record only declared that her license was expired.

of degree of crime convicted but sufficient evidence of lesser degree, court of appeals can modify the offense). Since under assignment of error one, this court is reversing and remanding for a new trial on the driving-without-a-valid-license charge due to the problems with the initial appearance, the resolution of this assignment finding insufficient evidence of the higher degree limits any retrial to a minor-misdemeanor offense of driving without a license. See *Lovejoy,* 79 Ohio St.3d at 450, 683 N.E.2d 1112; *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541 (double jeopardy bars retrial if appellate court finds insufficient evidence).

{¶ 90} We now turn to the charge alleging that appellant failed to comply. Some of the arguments concerning this issue are also contained within the third and fourth subassignments within her fifth supplemental assignment of error. Thus, those arguments will also be addressed at this time. Pursuant to R.C. 2921.331:

{¶ 91} "(A) No person shall fail to comply with any lawful order or direction of any police officer invested with authority to direct, control, or regulate traffic.

{¶ 92} "(B) No person shall operate a motor vehicle so as willfully to elude or flee a police officer after receiving a visible or audible signal from a police officer to bring the person's motor vehicle to a stop.

{¶ 93} "(C)(1) Whoever violates this section is guilty of failure to comply with an order or signal of a police officer."

{¶ 94} Appellant was charged with and convicted of division (B) of this failure-to-comply statute. She contends that there was insufficient evidence to support her conviction and that conviction of that offense was against the manifest weight of the evidence. Specifically, she contends that no evidence supported the conclusion that she was willfully fleeing or eluding. She complains that the court used a thesaurus to define these terms. She argues that fleeing means escaping by acceleration and eluding means escaping by guile, and she claims that she did neither.

{¶ 95} She also points out that the police did not charge her with failure to comply. Rather, the prosecution added this charge a month after the incident. She notes that the trooper's ticket gave notice of future charges for obstructing official business under R.C. 2921.31, which provides:

{¶ 96} "(A) No person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within the public official's official capacity, shall do any act that hampers or impedes a public official in the performance of the public official's lawful duties."

{¶ 97} The prosecution's bill of particulars stated that the obstruction offense (that was never actually charged) was for her initial refusal to supply identification. However, the trooper testified that he and his supervisor meant the charge

of obstructing official business to encompass all her acts, including her failure to immediately pull over. The trooper stated that he did not charge appellant with the fleeing-and-eluding division of failure to comply because she was not aggressively trying to get away. His sergeant testified that they were trying to give her the benefit of a doubt regarding her stated desire to get to a safe place before pulling over and that is why she was not charged with failure to comply. The obstructing charge, which was a second-degree misdemeanor, as opposed to failure to comply, which is a first-degree misdemeanor, was dismissed by the state before trial.

{¶ 98} Appellant then factually notes that the trooper and the trucker testified that she slowed to the minimum permitted speed on the turnpike of 45 miles per hour and drove in the right lane with her right turn signal on. She testified that her hand signals were an attempt to point at the green exit signs to show that she would get off at the next exit. She did in fact get off at the first available exit, three miles away. She states that the evidence established that she was merely trying to get to a safe, populated spot before pulling over due to prior traumatic experiences. She also testified that she ended up in the tollbooth line because the right berm next to the line had construction barrels so she thought she would pull over once she went through the gate.

{¶ 99} The trooper confirmed that appellant slowed to 45 or 50 miles per hour and moved to the right lane, leaving her right turn signal on. He testified that he did not know what her hand signals meant or he thought they meant she would be pulling over to the berm. He stated that there was plenty of clear, unobstructed berm on which to stop in the three miles before the exit. He noted that when she finally pulled into a tollbooth line, he feared she was attempting to go through the gateway. On cross-examination, he opined that she was trying to escape by making him give up or by getting far enough away for him to lose sight of her. The sergeant noted that some police chases are high speed and some are not, and he noted that they cannot know the intent of the driver with regards to why there is not an immediate stop. The trucker opined on cross-examination that she was not trying to accelerate into a high-speed chase but that she was "trying to do an O.J." It was also noted that appellant had a cell phone, but instead of calling 911 to explain her refusal to stop during the three-mile pursuit, she called Mr. Barnhill.

{¶ 100} First, we must determine whether, after viewing the evidence in the light most favorable to the state, some rational person could find that appellant's actions and/or omissions constituted willful fleeing and eluding. Neither word is defined in the Ohio Revised Code. See *State v. Thomas*, 106 Ohio St.3d 133, 2005-Ohio-4106, 832 N.E.2d 1190, ¶ 15 (as to fleeing). Thus, we turn to "the time-honored rule that words used by the General Assembly are to be

construed according to their common usage." Id., quoting *Van Fossen v. Babcock & Wilcox Co.* (1988), 36 Ohio St.3d 100, 103, 522 N.E.2d 489. The Supreme Court has stated that to flee is to run away from, to try to escape, to hasten for safety or to withdraw hastily. *Thomas,* 106 Ohio St.3d 133, 832 N.E.2d 1190, at ¶ 15, citing V Oxford English Dictionary (2d Ed.1989) 1037, and noting that Black's Law Dictionary (8th Ed.2004) 764 does not define fleeing.

{¶ 101} "Since the meaning to the average ordinary person is that with which we are concerned in construing criminal statutes, the words 'elude' and 'flee' as used in R.C. 4511.02 must be given their ordinary meaning. Webster's Third New International Dictionary defines 'elude' as 'to avoid slyly or adroitly (as by artifice, stratagem, or dexterity).' The same dictionary gives several definitions for 'flee,' including 'to run away,' or 'to endeavor to avoid or escape from' or 'to leave abruptly.' * * * Thus, it would appear that in the context of the statute the word 'flee' does connote haste and swiftness; whereas, the word 'elude' connotes the use of artifice." *Columbus v. Fantozzi* (Mar. 10, 1981), Franklin App. Nos. 80AP–737, 80AP–738, 80AP–739, and 80AP–740, 1981 WL 3046.

{¶ 102} These definitions appear sound. Thus, the court is left to decide whether a reasonable person could find that appellant was eluding by slyly avoiding with artifice, stratagem, or dexterity. The trooper opined that appellant was hoping to elude him. One could come up with various theories to support appellant's intent to elude. For instance, one could believe that she was trying to leave the jurisdiction and was hoping the trooper could not follow. Or one could believe that she was eluding the trooper by getting in the tollbooth line and hoping he got stuck behind cars. Furthermore, one could believe that she hoped the trooper would find someone else to pull over if she kept driving, such as the trucker who made unusual maneuverings, whom she did not know was the informant.

{¶ 103} Viewing the evidence in the light most favorable to the state, a rational person could find beyond a reasonable doubt that her actions after noticing the trooper's signals constituted eluding as she was engaging in actions that could be construed as designed to slyly avoid the trooper by artifice, guile, or stratagem. Upon being ordered to pull over, appellant made hand signals, which she now admits were confusing. The trooper used lights, sirens, an air horn, and a loudspeaker to impress upon her the importance of stopping immediately. Still, she drove three miles and exited the turnpike. She kept driving and entered a tollbooth line when the trooper approached and ordered her to hand over her keys. She admitted she was going to pass through the gateway. After considering all of this evidence in the light most favorable to the state, there is sufficient evidence of eluding.

{¶ 104} As for weight of the evidence, if her claim was believed that she was merely trying to find a safe, populated place to pull over, then a trier of fact could find that she was not guilty of the willful fleeing or eluding required by R.C. 2921.331(B). Although there comes a point when one cannot just keep searching for what one considers to be a safe place (what if the nearest exit was 20 miles away?), if her search for a location was considered unreasonable, some other crime could have been charged like obstructing or failure to comply under division (A). However, we are merely concluding that the trial court *could* have found she was not guilty, not that the court *had* to so find.

{¶ 105} This is because there exist two reasonable constructions of the conflicting evidence here: (1) eluding or (2) finding a safe place (whether reasonably or unreasonably). Thus, one can disbelieve appellant's testimony that she was only trying to find a safe place. The trial court was in the best position to judge her credibility. The fact that she was driving without a valid license can be considered a key piece of evidence as motive for eluding and provides weight in the state's favor. See *State v. Newsom*, Belmont App. No. 02BE28, 2003-Ohio-3284, 2003 WL 21448273, ¶ 26 (intoxication provides evidence of motive consistent with fleeing or eluding). The failure to stop even after the escalating use of the trooper's tools for conveying his demands is also relevant in weighing the evidence. The inferences the trial court drew from her behavior are rational. Thus, her conviction of failure to comply by willfully fleeing or eluding was not against the manifest weight of the evidence.

{¶ 106} Finally, we note that appellant's allegation concerning her lack of willful intent due to her husband's orders is addressed under supplemental assignment of error number five. We do not combine that argument here due to the separate and distinct issue surrounding the validity of her "coverture" defense.

## ASSIGNMENT OF ERROR NUMBER TWO

{¶ 107} Appellant's second assignment of error provides:

{¶ 108} "The appellant's constitutional and statutory rights to a speedy trial were violated when the appellant's trial did not commence until the ninety-fourth (94) day."

{¶ 109} The Sixth Amendment to the United States Constitution and Article I, Section 10 of Ohio's Constitution guarantee a criminal defendant the right to a speedy trial. In this state, that right is implemented by statutes imposing specific time limits. See *Brecksville v. Cook* (1996), 75 Ohio St.3d 53, 55, 661 N.E.2d 706. Here, appellant was to be tried within 90 days after her arrest. See

R.C. 2945.71(B)(2) (90 days for first-degree misdemeanor); R.C. 2945.71(D) (longest time applies when charged with multiple degrees).

▄▄▄ {¶ 110} As the state points out, the day of arrest does not count against the speedy-trial time. See Crim.R. 45(A) (the date of the act or event from which the designated period of time begins to run shall not be included); R.C. 1.14 ("[t]he time within which an act is required by law to be done shall be computed by excluding the first and including the last day"). The Eleventh District has previously held that the day of arrest does not count as any time, let alone triple time. *State v. Brown*, Ashtabula App. No. 2003–A–0092, 2005-Ohio-2879, 2005 WL 1383957, ¶ 22; *State v. Jones* (1997), 119 Ohio App.3d 59, 64, 694 N.E.2d 505, fn. 7. See, also, *State v. Turner*, Mahoning App. No. 93CA91, 2004-Ohio-1545, 2004 WL 614808, ¶ 23. Nonetheless, appellant's figures as corrected at oral argument correctly exclude the day of arrest.

{¶ 111} Ninety days passed from May 9, the day after her arrest, until August 6, the date trial commenced. Appellant states that she was confined in jail on May 8 and 9, 2003, and thus replaces May 9 with triple time under R.C. 2945.71(E) for a claimed total of 92 days.

{¶ 112} Initially, we point out to appellant that her speedy-trial arguments can only apply to the charges of child restraint and driving without a license since she was not charged with failure to comply until June.

{¶ 113} Next, we note that the state does not specifically claim that appellant was released on May 8, which would be the same evening that she was processed into the jail. Rather, the state's argument merely sets forth a single time count (with no allegations of tolling) starting on May 9 and equaling 90 days on August 6. Thus, the state's count either assumes that she was released on May 8 or that being released very early on May 9 would not count as a day.

▄▄▄ {¶ 114} As for the latter proposition, the date bond is posted and the defendant is released counts as a day in jail for triple-time purposes. *Brown*, Ashtabula App. No. 2003–A–0092, 2005 WL 1383957 at ¶ 22, citing *Jones*, 119 Ohio App.3d at 64, 694 N.E.2d 505. See, also, *State v. Madden*, Franklin App. No. 04AP–1228, 2005-Ohio-4281, 2005 WL 1983376, ¶ 31. As for the former proposition, there is evidence suggesting that appellant was incarcerated for some amount of time on May 9, 2003.

{¶ 115} At trial, it was established that the traffic stop occurred just after 5:00 p.m. on May 8, 2003, and that she was not brought to the police station until Mr. Barnhill arrived to pick up the baby between 6:30 and 7:00 p.m. The trooper disclosed that she was booked into the Portage County Jail for processing since the clerk's office was not open for posting bail. When the state was questioning appellant at trial about when the incident took place, she stated, "May 8th, but

technically part into May 9th." One could infer from this that she was not released until the early morning hours of May 9.

{¶ 116} Furthermore, a bail document filed May 9, 2003, states that appellant appeared before the municipal court clerk on May 8, 2003, and entered into a ten-percent bond. It also stated that appellant was to appear on May 9, 2003, at 8:15 a.m. to answer for her charges. However, the nine in the appearance date was written over top of an eight. Since testimony by a police officer established that the clerk's office was closed on May 8 by the time of her arrest and that is why she was sent to jail, one is curious as to how she appeared before the clerk on that day. One wonders if the clerk accidentally wrote May 8 twice (the date appellant appeared before her to post bond and the date of the appearance) and then only corrected it in the blank dealing with the date of the appearance. In fact and most importantly, the docket states that Mr. Barnhill posted bail for appellant on May 9 at midnight. Thus, May 9 would count as triple time if a speedy-trial motion had been filed and a hearing held on that motion.

{¶ 117} However, as the state points out, no motion to dismiss for speedy-trial violations was filed in this case. Pursuant to R.C. 2945.73(B): "Upon motion made at or prior to the commencement of trial, a person charged with an offense shall be discharged if he is not brought to trial within the time required." Since no motion was filed, appellant waived the issue.

{¶ 118} At this point, appellant asserts an ineffective-assistance-of-counsel argument. Throughout the briefs, appellant sets forth various allegations of ineffective representation or denial of the right to counsel. Here, she claims that her appointed counsel should have filed a motion to dismiss on speedy-trial grounds on the morning of her trial before withdrawing his representation.

{¶ 119} In reviewing whether a criminal defendant has received adequate representation, the defendant has the burden of proving ineffective assistance of counsel. *State v. Lott* (1990), 51 Ohio St.3d 160, 175, 555 N.E.2d 293. To meet this burden, the defendant must meet a two-pronged test. First, she must show that counsel's performance was deficient. Id. at 174, 555 N.E.2d 293, citing *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. Second, she must demonstrate that the deficient performance prejudiced her defense, thus depriving her of a fair trial. Id.

{¶ 120} In order to establish that counsel's performance was deficient, appellant must demonstrate that the performance on the issue at hand fell below an objective standard of reasonable representation. *State v. Keith* (1997), 79 Ohio St.3d 514, 534, 684 N.E.2d 47. To then demonstrate that she was prejudiced by this alleged deficient performance, appellant must prove that there exists a reasonable probability that the outcome of the proceedings would have been

different were it not for counsel's errors. Id. "Reasonable probability" has been defined as a probability sufficient to undermine confidence in the outcome. *State v. Bradley* (1989), 42 Ohio St.3d 136, 142, 538 N.E.2d 373.

{¶ 121} We conclude that there is no ineffective assistance for failure to file a speedy-trial motion because even if appellant deserves triple time for May 9, more than 90 days had not elapsed due to certain tolling events. For instance, there was a request for discovery and a bill of particulars.

{¶ 122} In a case decided by the Ohio Supreme Court, the defendant's case was set for trial, and he was ordered to remain in jail pending trial. See *State v. Brown*, 98 Ohio St.3d 121, 2002-Ohio-7040, 781 N.E.2d 159. His counsel filed a request for discovery and for a bill of particulars, and the state responded seven days later. The speedy trial time seemed to have run by the time of the trial, as 92 days had passed. However, defense counsel did not file a motion to dismiss. On appeal, the defendant claimed ineffective assistance of counsel for this failure.

{¶ 123} The Supreme Court held that the speedy-trial time did not in fact run because the request for discovery and a bill of particulars are tolling events. Id. at ¶ 22, 26, citing R.C. 2945.72(E) (the time within which an accused must be brought to trial may be extended by any period of delay necessitated by reason of a plea in bar or abatement, motion, proceeding, or action made or instituted by the accused). This is true even though the motions themselves do not cause a rescheduled trial date. See id. at ¶ 2–3, 23 (the motions detract from the state's time to prepare and thus necessitate delay). Due to the tolling event, the court concluded there was no ineffective assistance of counsel in failing to file a speedy-trial dismissal motion. Id.

{¶ 124} Here, appellant filed a request for a bill of particulars on May 13, 2003; the state responded on May 28, 2003. Thereafter, on July 22, 2003, counsel filed a request for discovery, which was answered that same day. At the very least, two days would be subtracted for the tolling events of the request for a bill of particulars and the later demand for discovery. Two days is all the state needs to show compliance. Moreover, counsel overlooks the fact that appellant filed a myriad of motions in the days after her arrest, which had to be read to determine if a response was necessary.

{¶ 125} We recognize that the state fails to raise any of these tolling events in their brief. True, the state would have the burden to establish tolling events in a speedy-trial hearing. *State v. Butcher* (1986), 27 Ohio St.3d 28, 31, 27 OBR 445, 500 N.E.2d 1368. However, this does not preclude us from reviewing the file for tolling events to determine if appointed counsel was deficient or if prejudice is apparent. In doing so, we conclude that counsel's performance was not deficient

in this regard and there is no showing of prejudice in any event. Hence, this assignment of error is overruled.

## ASSIGNMENT OF ERROR NUMBER THREE

{¶ 126} The third assignment of error set forth by appointed counsel contends:

{¶ 127} "The appellant was denied due process of law and a fair trial when she was stopped by the Ohio Highway Patrol for a seatbelt violation."

{¶ 128} As the state points out, appellant waived the issues concerning the propriety of the stop by failing to file a motion to suppress any evidence gained therefrom. See Crim.R. 12(C)(3); Traf.R. 12(B)(2)(a). Appellant thus argues that appointed counsel was ineffective by failing to file a suppression motion to contest the validity of the stop. She raises various arguments as to why she believes suppression would have been granted had a motion been filed.

{¶ 129} Initially, appellant contends that one cannot be stopped for the sole purpose of a child-restraint violation. Here, appellant incorrectly cites R.C. 4507.05(G)(1) dealing with temporary-permit drivers. See R.C. 4507.05(A). She likely meant to cite the provision in the general seatbelt law prohibiting an officer from stopping a vehicle merely for a seatbelt violation. See R.C. 4513.263(D). Nevertheless, that statute specifically excludes child-restraint violations, and the child-restraint law does not have a similar prohibition against stopping vehicles based solely on that violation. See R.C. 4511.81; R.C. 4513.263(C).

{¶ 130} Regardless, appellant's arguments as to child restraint are irrelevant where, as here, the officer claims to have pulled appellant over for speeding. Appellant states that the speeding allegation was merely a pretext to stop her based upon the trucker's claim that there was a baby on her lap. She urges that she was not in fact speeding, pointing to the trooper's admission that his speed readout stated only 62 when appellant was placed in his vehicle.

{¶ 131} First of all, we must point out that police officers do not need probable cause to stop a vehicle. *Terry v. Ohio* (1968), 392 U.S. 1, 22, 88 S.Ct. 1868, 20 L.Ed.2d 889. Rather, only reasonable suspicion is needed. Id. Reasonable suspicion merely requires the officer to point to reasonable and articulable facts, which under the totality of the circumstances, including any rational inferences, reasonably warrant an investigative stop. *State v. Andrews* (1991), 57 Ohio St.3d 86, 87, 565 N.E.2d 1271. There need only be a particularized and objective basis for suspecting the particular person of criminal activity to conduct a stop. Id. In any event, observing a traffic violation is more than reasonable suspicion; it is probable cause. *Dayton v. Erickson* (1996), 76 Ohio St.3d 3, 9, 11–12, 665 N.E.2d 1091. So, if an officer observes any minor traffic violation, an

investigatory stop is more than valid. See *State v. Brownlie* (Mar. 31, 2000), Portage App. Nos. 99–P–0005, 99–P–0006, 2000 WL 522463.

{¶ 132} Additionally, "where an officer has an articulable reasonable suspicion or probable cause to stop a motorist for any criminal violation, including a minor traffic violation, the stop is constitutionally valid regardless of the officer's underlying subjective intent or motivation for stopping the vehicle in question." *Erickson,* 76 Ohio St.3d at 11–12, 665 N.E.2d 1091. Thus, even if the stop for speeding was pretextual, the stop is not invalid if there was reasonable suspicion of speeding. See id.

{¶ 133} Here, the trooper stated that he clocked appellant three times, the highest of which resulted in a speed reading of 68 in a 65-mile-per-hour zone. The fact that the trooper stopped appellant for speeding without issuing a speeding ticket does not require a conclusion that she was not speeding or that reasonable suspicion was lacking. See *State v. Robinette* (1995), 73 Ohio St.3d 650, 653, 653 N.E.2d 695 (valid stop based on speeding even where no speeding ticket was issued). It is clear that if appellant traveled over the posted speed limit, then there was reasonable suspicion for the stop.

{¶ 134} This court must still determine whether the failure to file a suppression motion was deficient performance, and if so, whether the court's confidence in the outcome is undermined as a result of the omission. The failure to file a motion to suppress is not ineffective assistance of counsel per se. *State v. Madrigal* (2000), 87 Ohio St.3d 378, 389, 721 N.E.2d 52 (but discussing tactical reasons for the failure to file). In nearly every case, the defendant could argue and the court could potentially find that the officer or witness lied when they claimed to observe an offense or acts constituting probable cause or reasonable suspicion. However, this possibility alone does not absolutely require counsel to file a suppression motion.

{¶ 135} Notably, there was a lack of communication between appellant and counsel in the weeks before trial after counsel was appointed. By the time appellant made herself available, the time for filing pretrial motions was over. Crim.R. 12(D). Without being made aware of appellant's claim that she was not speeding or that she saw a readout of 62 on the trooper's display, counsel would not have known the ultimate basis for filing a motion to suppress, that is, to challenge the trooper's credibility on her speed.

{¶ 136} After finally meeting with appellant, counsel could have determined all necessary matters and sought leave to file a late motion under Crim.R. 12(D) in the interests of justice. However, there is no indication that appellant advised counsel of her allegations. Moreover, a request for leave to file a suppression motion on the morning of trial likely would have been denied. In any event,

appellant essentially refused representation by appointed counsel or anyone else at the public defender's office and forced counsel's withdrawal. Regardless, since we are reversing under assignment of error number one, this issue is moot as she can file a suppression motion on remand.

## ASSIGNMENT OF ERROR NUMBER FOUR

{¶ 137} The fourth assignment of error set forth by counsel argues:

{¶ 138} "The appellant was denied due process of law and a fair trial because of the failure of the state to answer the appellant's request for discovery and request for a bill of particulars."

{¶ 139} The first issue presented concerns the sufficiency of the state's bill of particulars. Appellant contends that the content of the bill of particulars provided by the state is solely a recitation of the language and name of the statutes alleged to be violated and that such content is insufficient.

{¶ 140} Upon timely written request, "the prosecuting attorney shall furnish the defendant with a bill of particulars setting up specifically the nature of the offense charged and of the conduct of the defendant alleged to constitute the offense." Crim.R. 7(E). "A bill of particulars has a limited purpose—to elucidate or particularize the conduct of the accused alleged to constitute the charged offense. * * * A bill of particulars is not designed to provide the accused with specifications of evidence or to serve as a substitute for discovery." *State v. Sellards* (1985), 17 Ohio St.3d 169, 171, 17 OBR 410, 478 N.E.2d 781. Even if the bill of particulars is insufficient in itself, the defendant must show that lack of knowledge of certain facts required to be placed in the bill of particulars prejudiced his ability to fairly defend himself. *State v. Chinn* (1999), 85 Ohio St.3d 548, 569, 709 N.E.2d 1166.

{¶ 141} As for all three charges at issue, the state claims that it provided the name, elements, and degree of the offense along with the city and date of occurrence. All known facts surrounding the offense need not be disclosed in the bill of particulars. *Sellards,* 17 Ohio St.3d at 171, 17 OBR 410, 478 N.E.2d 781. The issue surrounding nonresidents complying with the law of their state is an affirmative defense the defendant must present to the court, not something the state must disprove. R.C. 4511.81(F).

{¶ 142} However, if the state would have presented all of the essential elements of the child-restraint offense in the bill of particulars, then someone might have realized that one of these elements was lacking as discussed above under assignment of error number five. We note that a traffic ticket does not set forth elements. As discussed above, the trial court failed to even mention the child-restraint charge at the initial appearance, so the elements were not an-

nounced there either. Thus, the state's omission of the phrase "that is registered in this state" after "in a motor vehicle" was misleading. Nevertheless, any issues surrounding this charge are remedied by the result of assignment of error number five reversing the child-restraint charge with prejudice.

{¶ 143} As for the driving-without-a-valid-license charge, the state did not provide that her license was expired for more than six months as its reason for claiming the offense was a first-degree misdemeanor. In any case, this issue is encompassed under assignment of error number five where appellant's charge is modified to a minor misdemeanor due to the lack of evidence that her license was expired for more than six months.

{¶ 144} Regarding the failure-to-comply charge, appellant fails to indicate what required information was lacking. Appellant also fails to indicate how she was prejudiced in preparing her defense. Besides the name, elements, degree, city, and date of offense, the state added: "Specifically, by refusing to stop after receiving a visible and audible signal from Trooper A.M. Doles and continuing to drive for approximately three miles." This is sufficient to meet the state's duty to provide a bill of particulars on the failure-to-comply charge.

{¶ 145} The second argument under this assignment of error is that open-file discovery does not comply with Crim.R. 16. Appellant alleges she was prejudiced as a result of this process because she did not receive any discovery and does not know whether her counsel utilized the open-file discovery process. Specifically, she complains that she had never seen the certified copy of her Michigan driving record before trial. She also complains that she was not given the names, addresses, and prior convictions of the state's witnesses. She further alleges the state's failure to disclose a piece of exculpatory evidence.

{¶ 146} As to the latter proposition, the prosecutor must furnish any exculpatory evidence. Crim.R. 16(B)(1)(f). Appellant states that the existence of her nursing pillow in her car is exculpatory since she is using Michigan's nursing defense to the child-restraint charge as permitted under Ohio's child-restraint law. See R.C. 4511.81(F). She points to the vehicle towing inventory, which lists a pillow. However, we cannot agree that the state would be aware that the listing of "pillow" in the inventory could constitute exculpatory evidence.

{¶ 147} As to the witness list, the state filed a list with the names, addresses, and prior convictions of its witnesses on July 22, 2003. This witness list was certified as being personally handed to appellant's attorney. Thus, the state satisfied its duty under Crim.R. 16(B)(1)(e).

{¶ 148} On that same date, the state filed and handed to appellant's attorney a response to appellant's discovery request, which invited appellant and her counsel to inspect the file at the prosecutor's office where copies could be made at no

cost. Crim.R. 16(B) specifically provides that the state shall *"permit the defendant to inspect and copy * * * any books, papers, documents,* photographs, tangible objects, buildings or places, or copies or portions thereof, available to or within the possession, custody or control of the state, and *which are material to the preparation of his defense, or are intended for use by the prosecuting attorney as evidence at the trial,* or were obtained from or belong to the defendant." (Emphasis added). Crim.R. 16(B)(1)(c).

{¶ 149} The state intended to and did use appellant's driving record as evidence at trial to establish that she was driving without a valid license. See *State v. Williams* (Dec. 13, 1988), Tuscarawas App. No. 88AP070047, 1988 WL 138481 (applying Crim.R. 16(B)(1)(c) to the defendant's driving record in a driving-under-suspension case). The rule explicitly allows disclosure of documents which the state intends to use at trial by inviting the defendant to come to the prosecutor's office. Crim.R. 16(B)(1)(c). Thus, if we applied the holding in *Williams,* open-file discovery is sufficient to satisfy the state's duty regarding appellant's driving record.

{¶ 150} We do note that Crim.R. 16(B)(1)(b) requires the prosecutor to "furnish" defendant a copy of her prior criminal record. This section (along with the witness-list section) does not mention that the state can merely permit the defendant to inspect and copy as sections (a), (c) and (d) allow. Use of the word "furnish" places an affirmative duty on the prosecutor to produce and hand over, rather than allowing reliance on open-file discovery. See *State v. Dye* (Oct. 6, 1995), Trumbull App. No. 94–T–5096, 1995 WL 787464 (witness list should have been furnished outside of open-file discovery, but finding no intent to avoid discovery obligations and finding that the defendant should have filed a motion to compel discovery of the witness list in response to an open-file invitation). In fact, as aforementioned, the state did provide a witness list rather than rely on open-file discovery to fulfill its duty to "furnish" under Crim.R. 16(B)(1)(e). This act could be construed as the state acknowledging a duty above open-file discovery when the term "furnish" is used in Crim.R. 16. Still, the state may believe that a driving record is not a "prior criminal record" and thus need not be affirmatively furnished under Crim.R. 16(B)(1)(b).

{¶ 151} It is well established that the state's failure to provide discovery is reversible error if there is a showing that the prosecution's failure to disclose was a willful violation of Crim.R. 16, that foreknowledge of the statement would have benefited the accused in the preparation of his defense, or that the accused was prejudiced by the use of the statement. *State v. Parson* (1983), 6 Ohio St.3d 442, 6 OBR 485, 453 N.E.2d 689, syllabus. However, the issue here is moot as we have already remedied any prejudice to the defense. For instance, any prejudice resulting from appellant's inability to defend against the degree of the offense is

remedied by our modification of the offense from a first-degree misdemeanor to a minor misdemeanor. Any other prejudice is remedied by our remand for new proceedings beginning with the initial appearance. Thus, we need not formulate a set rule for the Eleventh District on this matter.

## ASSIGNMENT OF ERROR NUMBER SIX

{¶ 152} The sixth and final assignment of error set forth by counsel contends:

{¶ 153} "The entire atmosphere of the trial proceedings were so tainted that the appellant did not receive a fair trial and was denied due process of law."

{¶ 154} Initially, we point out that some of the arguments under this assignment of error dealing with ineffective assistance of counsel are discussed elsewhere. For instance, in assignment of error number two, we disposed of the argument regarding the failure to file a motion to dismiss on speedy-trial grounds. Additionally, in assignment of error number three we addressed the failure to file a suppression motion. Any ineffective assistance in the failure to raise the argument regarding the improper-child-restraint charge is remedied under assignment of error five. She also raises the lack of a jury demand as ineffective assistance of counsel. This issue is essentially resolved in assignment of error number one where she complained that she was unaware of the right to a jury and the need to demand one due to the inadequacies of her initial appearances.

{¶ 155} Under this assignment, appellant also complains that the assistant prosecutor who represented the state at trial was also the complainant on the failure-to-comply charge. She objected to this before trial and she asked that he be subject to the separation-of-witnesses order. She now claims that the prosecutor should have withdrawn when she advised that she wanted to call him as a witness, citing DR 5–102. She also notes the prosecutor's complaints that she tried to intimidate him and concludes that his disrespect for her is likely the reason he filed two extra charges a month after the incident.

{¶ 156} However, the assistant prosecutor did not need to withdraw because he had no factual knowledge of the offense. We note that he was not subpoenaed, and in any event, she could not have forced him to testify at trial on the grounds alleged. See Evid.R. 602. Additionally, the assistant prosecutor's motive for filing more charges than those cited by the trooper is not relevant for purposes of determining the lawfulness of her conviction on appeal, just as an officer's motive for conducting an investigatory stop or issuing a ticket does not void the existence of probable cause. See *Erickson*, 76 Ohio St.3d at 11–12, 665 N.E.2d 1091 (consideration of objective facts, not underlying subjective intent).

Rather, we review the final propriety of those charges and convictions, which we have done as requested in the relevant assignments of error.

{¶ 157} Furthermore, merely because the prosecutor signed and filed the failure-to-comply complaint does not mean he is subject to a separation of witnesses or is required to withdraw as prosecuting counsel at trial. It is one of the prosecutor's duties to file complaints. R.C. 2935.09. He disclosed his signing in his official capacity. See id. And his testimony was not relevant to the trial issues, even if it could have been relevant to pretrial matters regarding probable cause for a summons.

{¶ 158} Even assuming arguendo that there is some defect in the complaint, Crim.R. 33(E)(1) provides that a conviction cannot be reversed due to an inaccuracy or imperfection in the complaint if it is sufficient to fairly and reasonably inform the defendant of all the essential elements. The complaint here sufficiently informed appellant of the essential elements of failure to comply with an order or signal of a police officer under R.C. 2921.331(B): operating a motor vehicle so as willfully to elude or flee a police officer after receiving a visible or audible signal from a police officer to bring the person's motor vehicle to a stop.

{¶ 159} Appellant also complains here that the trial court permitted seven representatives from broadcast stations plus four from the print media to attend the trial. She contends that by permitting all these media representatives, the court created a circus-like atmosphere. See *Sheppard v. Maxwell* (1966), 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600. See, also, *State v. Neely* (July 13, 1981), Mahoning App. No. 80CA2, 1981 WL 4743 (noting that in *Sheppard*, there were waves of disruption and interruption, media threats, extreme pretrial publicity and tampering with evidence, jurors and public officials, all resulting in a mockery of both the justice system and the media).

{¶ 160} Initially, we note that this was a bench trial, not a jury trial where issues of publicity or influence were a concern. Furthermore, "there is nothing that proscribes the press from reporting events that transpire in the courtroom." *Sheppard*, 384 U.S. at 362, 86 S.Ct. 1507, 16 L.Ed.2d 600. Public access to a criminal trial has been described as essential to the fair and orderly administration of justice. *State ex rel. Natl. Broadcasting Co., Inc. v. Court of Common Pleas of Lake Cty.* (1990), 52 Ohio St.3d 104, 108, 556 N.E.2d 1120. See, also, Section 16, Article 1 of the Ohio Constitution ("[A]ll courts shall be open").

{¶ 161} All news participants here received prior written approval of the court and were given certain standards of conduct. See Sup.R. 12. Appellant does not point to any objection made to the trial court as to the presence, amount,

or location of any of the media representatives present. Had she done so, the trial court could have alleviated any particular concerns. Her failure constitutes waiver. See *State ex rel. Miami Valley Broadcasting Corp. v. Kessler* (1980), 64 Ohio St.2d 165, 168, 18 O.O.3d 383, 413 N.E.2d 1203 (party seeking limitation on coverage has burden to overcome presumption of fair trial).

{¶ 162} Even on appeal, appellant does not set forth any specific problems with the media other than her blanket statement that a courtroom "full of news cameras" is prejudicial in itself (or at least as part of cumulative error). This proposition is untenable. See *Miami Valley*, 64 Ohio St.2d at 167, 18 O.O.3d 383, 413 N.E.2d 1203 (news coverage of trials is not per se inconsistent with a fair and impartial trial). Finally, there is no indication on the record of actual interruption, disruption, or influence of the media. See *Neely*, Mahoning App. No. 80CA2, 1981 WL 4743. Thus, this argument is without merit.

## SUPPLEMENTAL ASSIGNMENT OF ERROR NUMBER ONE

{¶ 163} The first supplemental assignment of error set forth by appellant pro se alleges:

{¶ 164} "The clear bias of the court in its role as the finder of fact was prejudicial to appellant's right to a fair trial."

{¶ 165} Under this assignment, appellant contends that the trial court had a clear disdain for those who seek to uphold their own rights. In support of this contention, she cites a four-page discussion between the court and herself. In this discussion, the court seemed to scold appellant for putting her rights and her crusade against the government above the welfare of her child.

{¶ 166} Contrary to appellant's suggestion, the disputed comments did not occur during trial. Rather, they occurred only after appellant was found guilty and sentencing had commenced (although sentencing was then continued and set for a later date at appellant's urging). Thus, the comments did not affect the trial. As the state points out, the court's attitude throughout the trial must be considered as a whole. In our reading of the over 500–page trial transcript, there is no indication of bias that would result in an unfair trial. The court allowed many leniencies for this pro se defendant and even expressed that he was impressed with her knowledge of the law and her preparedness.

{¶ 167} Additionally, appellant succeeded in having her sentencing postponed after the disputed comments took place. In the four months while she was awaiting sentencing, she could have raised any bias issues in an affidavit of disqualification with the Chief Justice of the Ohio Supreme Court, who has exclusive jurisdiction on such matters. See Section 5(c), Article IV, Constitution;

R.C. 2701.03. See, also, *Beer v. Griffith* (1978), 54 Ohio St.2d 440, 441–442, 8 O.O.3d 438, 377 N.E.2d 775. This assignment of error is without merit.

## SUPPLEMENTAL ASSIGNMENT OF ERROR NUMBER TWO

{¶ 168} Appellant's second pro se supplemental assignment of error contends:

{¶ 169} "The court erred to the prejudice of Catherine at sentencing by 'convicting' her of the charge on which she was acquitted and convicting her of charges that are yet to be adjudicated."

{¶ 170} Appellant argues that the sentencing court improperly considered Michigan charges that had been dismissed and Maryland charges that had yet to be tried. However, a presentence investigation report was generated and considered in this case upon appellant's own request. See, e.g., Crim.R. 32.2; R.C. 2947.06; R.C. 2951.03. Presentence investigations include matters such as pending charges and prior arrests. Moreover, it is well established that the sentencing court can consider mere arrests for other crimes. *State v. Burton* (1977), 52 Ohio St.2d 21, 23, 6 O.O.3d 84, 368 N.E.2d 297; *State v. Greitzer*, Portage App. No. 2003–P–0110, 2005-Ohio-4037, 2005 WL 1862121, ¶ 65 (recently confirming that a sentencing court can weigh factors such as prior arrests and charges, even though such arrests and charges did not lead to convictions). Consequently, this argument is without merit.

## SUPPLEMENTAL ASSIGNMENT OF ERROR NUMBER THREE

{¶ 171} In her third pro se supplemental assignment of error appellant contends:

{¶ 172} "The court erred to the prejudice of Catherine by denying to Catherine her right to assistance of counsel at every critical stage."

{¶ 173} Appellant first contends that the lack of counsel at arraignment is prejudicial if the defendant lost the right to assert a defense. See *Hamilton v. Alabama* (1961), 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114 (where insanity defense was lost when not pled at arraignment). Appellant believes she similarly lost the right to present her "coverture defense." However, this is not true. In Ohio, there is no per se prejudice by the lack of an attorney at the initial appearance if a not-guilty plea is entered. *State v. Davis* (1991), 62 Ohio St.3d 326, 349, 581 N.E.2d 1362. In fact, no defenses were required to be presented at the initial appearance in order to be preserved. Her coverture arguments could be and were raised thereafter. Thus, this argument is without merit.

{¶ 174} She then complains about the lack of counsel at the pretrial and the failure to place the pretrial on the record in open court. She cites Crim.R. 17.1,

22, and 44. After her May 9, 2003 initial appearance, the child-restraint and driving-without-a-valid-license offenses were set for pretrial on June 9, 2003. This happened to be the same date on which her initial appearance on the failure-to-comply charge was later scheduled.

{¶ 175} There are no specific Traffic Rules related to pretrial. Pursuant to Traf.R. 20, where no procedure is specified by the Traffic Rules, the Criminal Rules and the applicable law apply. Concerning pretrial, Crim.R. 17.1 provides:

{¶ 176} "At the conclusion of a conference the court shall prepare and file a memorandum of the matters agreed upon. * * * The court shall not conduct pretrial conferences in any case in which a term of imprisonment is a possible penalty unless the defendant is represented by counsel or counsel has been waived pursuant to Crim.R. 44. In any case in which the defendant is not represented by counsel, any pretrial conference shall be conducted in open court and shall be recorded as provided in Crim.R. 22."

{¶ 177} First, we note that a Crim.R. 17.1 pretrial report was filed by the state in the failure-to-comply case. However, one was not filed in the traffic case, which was the only case for which a pretrial even was set. Thus, she attended a pretrial on charges without being given notice of the charges before she arrived.

{¶ 178} Second, since appellant was not represented by counsel, the pretrial had to be conducted in open court and recorded. There is no indication in the docket or elsewhere that a pretrial was held in open court. Nor does the state so contend.

{¶ 179} Third, appellant was not represented by counsel at the pretrial, and since the pretrial was not recorded, counsel was not waived pursuant to Crim.R. 44. Pursuant to Crim.R. 44(C), waiver of counsel shall be in open court, and the advice and waiver shall be recorded as provided in Crim.R. 22. Without counsel or a recorded waiver, the pretrial was impermissible under Crim.R. 17.1.

{¶ 180} The purpose of these pretrial procedures is to protect the defendant in the plea-bargaining process and to ensure the defendant is not presented with incorrect information concerning the charges by opposing counsel, who has no interest in protecting his rights. The unrepresented defendant alone with the prosecutor may be improperly prompted to make revealing and incriminating statements that the prosecutor could later use in examining witnesses at trial or in cross-examining the defendant. Notably, the state does not respond to any of these problematic issues surrounding the pretrial. Since we are reversing and remanding this case due to the initial appearance issues set forth in assignment of error number one, this pretrial issue becomes moot, but the problem should still be avoided on remand.

{¶ 181} Next, appellant contends that she was denied the right to counsel at trial and sentencing. In support, she states that she informed the trial court that she required counsel that conformed to her religious beliefs and declared that she was not competent to proceed. She claims that the Office of the Public Defender was inadequate to protect her interests.

{¶ 182} Appellant refused the services of appointed counsel and the entire public defender's office unless they signed a contract of representation agreeing to raise all defenses she listed regardless of whether there was a good-faith basis in existing law. Thus, the court granted her request to dismiss counsel. Since it was the morning of trial and appellant failed to seek substitution earlier, the court could reasonably deny a continuance, which she did not in fact seek. Rather, she continued in her effort to explain that she was there to represent the interests of Mr. Barnhill, who she claimed should have been substituted as the defendant, and that his first choice of counsel would be her. She also continued to cite an earlier filing demanding that the court allow her lay representation by Mr. Barnhill.

{¶ 183} As the state responds, there is no right to a choice of counsel. *State v. Cowans* (1999), 87 Ohio St.3d 68, 72, 717 N.E.2d 298. In fact, a defendant has no constitutional right to determine trial tactics and strategy of counsel. Id.; *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 150. Rather, decisions about viable defenses are the exclusive domain of defense counsel after consulting with the defendant. Id.

{¶ 184} Besides having no right to choice of appointed counsel, one also has no constitutional right to representation by a lay person. See, e.g., *State v. Studer* (Nov. 25, 1991), Butler App. No. CA91–06–101, 1991 WL 247525; *Shaker Hts. v. Carroll* (Mar. 5, 1987), Cuyahoga App. No. 51832, 1987 WL 7442; *State v. Duke* (June 25, 1986), Hamilton App. Nos. C–850696 and C–850697, 1986 WL 7137; *State v. Matthews* (June 13, 1985), Franklin App. No. 85AP–59, 1985 WL 10320. For the court to allow such representation would have been to permit the unauthorized practice of law in violation of R.C. 4705.01. See, also, Gov.Bar R. IV. Instead, the court allowed appellant to dismiss her appointed attorney and afforded appellant her right to self-representation after an inquiry into whether she fully understood and intelligently waived her right to counsel. See *State v. Jordan*, 101 Ohio St.3d 216, 2004-Ohio-783, 804 N.E.2d 1, ¶ 26. For all of these reasons, appellant's arguments here are without merit.

## SUPPLEMENTAL ASSIGNMENT OF ERROR NUMBER FIVE

{¶ 185} Appellant's fifth pro se assignment of error alleges:

{¶ 186} "The court erred to the prejudice of Catherine because its verdict with respect to the failure to comply charge was contrary to law."

{¶ 187} Initially, we note that the third and fourth subassignments argued under this assignment of error were analyzed above. These concerns dealt with the evidence of eluding and were thus discussed under counsel's fifth assignment of error on sufficiency and weight of the evidence.

{¶ 188} Appellant's first subassignment of error herein raises what she coins a "coverture defense." She states that Mr. Barnhill directed her over the phone on how to proceed upon seeing the trooper's lights and that she was required to obey him under her religion. She continues that a woman under coercion of her husband has no will and so is without the ability to perform a willful act such as fleeing or eluding. She concludes that a woman under coverture can only be charged with crimes such as treason, murder, and manslaughter.

{¶ 189} In the sense used by appellant, coverture is defined as the condition of a married woman (or "feme covert") with the attached legal disabilities of a wife that formerly existed at common law. See Black's Law Dictionary (6th Ed.1990) 366, 617. More particularly:

{¶ 190} "At common law, husband and wife were regarded as one. The legal existence of the wife during coverture was merged with that of her husband. As such, the wife was incapable of making contracts, of acquiring property, or of disposing of property without her husband's consent. In pursuance of a more liberal policy in favor of the wife, statutes were passed across the country to relieve the married woman from the disabilities imposed upon her as a feme covert by the common law. *Thompson v. Thompson* (1910), 218 U.S. 611, 614–615, 31 S.Ct. 111, 54 L.Ed. 1180, 1181." *State v. Lilly* (1999), 87 Ohio St.3d 97, 100, 717 N.E.2d 322 (statutes related to civil-law context).

{¶ 191} In the criminal-law arena, there once existed a defense in the form of a rebuttable presumption that a married woman who committed a criminal act in the presence of her husband acted under his coercion and thus was not criminally liable for the offense. *Tabler v. State* (1877), 34 Ohio St. 127, 134. The state had to rebut this presumption with evidence that the married woman acted voluntarily and not under her husband's coercion, and then she could be prosecuted as the "feme sole." Id. This theory seems to be the crux of appellant's argument on appeal.

{¶ 192} First of all, the "coverture defense" only applied to a married woman. The evidence of a valid marriage could reasonably be found to be lacking in this case. A common-law marriage must be established by clear and convincing evidence. *Staudenmayer v. Staudenmayer* (1998), 552 Pa. 253, 714 A.2d 1016; *State v. DePew* (1988), 38 Ohio St.3d 275, 279, 528 N.E.2d 542. Mr.

Barnhill merely testified that in July 2001, he and appellant entered into a common-law marriage and that under Pennsylvania law two people can promise themselves to each other and then hold themselves out as married. Appellant also testified that they had a common-law marriage. Even if this is sufficient testimony of the required exchange of "verba in praesenti," i.e., words that establish the marriage contract in the present tense, the claim need not be believed as true merely because they say it is so. See *Staudenmayer* (finding woman's claim on exchange of words to lack credibility).

{¶ 193} We also note that their assertion of a contract was not supported by any concrete examples. See id. (in Pennsylvania, courts seem to use cohabitation and reputation as considerations to support the claim of a verbal contract, whereas in Ohio, they are all separate required elements). Nothing was set forth as to any of the factors that would support that they have been holding themselves out to the community as being married, as there is no mention of their general reputation. See id. (not partial or divided, but general reputation). In fact, there was evidence contra to the constant cohabitation consideration. See id. That is, to support her Michigan residency claim, appellant presented defense testimony that she maintains a legal residence in Michigan and spends much time there alone. Finally, we acknowledge that, in modern times, different last names do not matter as much in the equation of a common-law marriage. However, where the woman claims that her religion requires her subservience to her husband in all matters including violation of laws and submits that the husband is the sole head of household with the "one public voice," the existence of different last names is more telling.

{¶ 194} Second, as to the inapplicability of the coverture defense, the trial court could reasonably conclude in its province as the fact-finder that appellant acted voluntarily. See *Tabler*, 34 Ohio St. at 134. The court could thus hold her personally liable.

{¶ 195} Third, the Supreme Court's *Tabler* presumption required the husband to be present. Telephone communication does not meet this test. *State v. Journey* (Aug. 28, 1987), Scioto App. No. 1645, 1987 WL 16257 (where husband called wife and told her to bring his radio to the jail).

{¶ 196} Fourth, the presumption no longer stands. The Fourth District in *Journey* questioned without addressing whether the presumption is valid in light of the modern developments in law on equality of the sexes. In today's society, regardless of what individual couples believe and practice, the law does not recognize the husband as the "one public voice" or as the automatic head of household with supreme authority over his nonresponsible feme covert. See R.C. 3103.02 (statute entitled "The head of the family" was repealed). A married woman now has her own separate legal identity. *Damm v. Elyria Lodge No. 465*

(1952), 158 Ohio St. 107, 114, 48 O.O. 54, 107 N.E.2d 337. The statutory law of this state specifically provides: "Neither husband nor wife, as such, is answerable for the acts of the other." R.C. 3103.08 (entitled "Responsibility of spouses for acts of other"). Additionally, the Ohio Supreme Court has labeled the principle of one legal identity with the husband as the voice as "archaic." *State v. Mowery* (1982), 1 Ohio St.3d 192, 194–195, 1 OBR 219, 438 N.E.2d 897.

{¶ 197} Last, we note that appellant fails to set forth any evidence of the affirmative defense of duress other than the mere alleged existence of a marriage and a religious belief that a woman must obey her husband. "One of the essential features of the defense of duress is a sense of immediate, imminent death, or serious bodily injury if the actor does not commit the act as instructed." *State v. Getsy* (1998), 84 Ohio St.3d 180, 199, 702 N.E.2d 866. Based upon all of the foregoing reasons, appellant's coverture argument is without merit.

{¶ 198} Appellant's second subassignment contends that the court disregarded her testimony and that of Mr. Barnhill due to their refusal to take the standard oath before testifying. "Before testifying, a witness shall be sworn to testify the truth, the whole truth, and nothing but the truth." R.C. 2317.30 (entitled "Oath of witness"). See, also, R.C. 2945.46 (stating that the civil procedure for administering oaths and affirmations applies to criminal cases).

{¶ 199} The purpose of swearing or affirming a witness is two-fold. *In re Harris* (Mar. 20, 2001), Franklin App. No. 00AP–987, 2001 WL 266995. First, it serves to impress upon the witness the solemnity of the proceeding and the need to testify truthfully. Id. Second, it subjects the witness to the penalties for perjury if the testimony is later proven false. Id.

{¶ 200} "When an oath is required or authorized by law, an affirmation in lieu thereof may be taken by a person having conscientious scruples against taking an oath. An affirmation has the same effect as an oath." R.C. 3.20 (entitled "Oath includes affirmation"). "A person may be sworn in any form he deems binding on his conscience." R.C. 3.21 (entitled "Form of oath").

{¶ 201} Here, appellant and Mr. Barnhill refused to take an oath based on religious beliefs. The court inquired further as to whether they would promise to tell the truth in a binding manner. They both agreed. There is no indication that the court disbelieved their testimony merely because they exercised their right to refuse to take an oath. This argument is overruled.

## CUMULATIVE ERROR

{¶ 202} Within many of the assignments of error, appellant argues cumulative error. Under the doctrine of cumulative error, a conviction can be reversed when the cumulative effect of errors in a trial deprives a defendant of

the constitutional right to a fair trial even though each of the errors does not individually constitute cause for reversal. *State v. Garner* (1995), 74 Ohio St.3d 49, 64, 656 N.E.2d 623. Thus, if various errors were found to be harmless error, the appellate court can still reverse based upon the effect of all of these harmless errors together. Id. Due to our resolution of appellant's other assignments of error, we need not actually resort to the doctrine of cumulative error.

## CONCLUSION

{¶ 203} For the foregoing reasons, the child-restraint charge is reversed with prejudice due to insufficient evidence on an essential element. The two remaining convictions are reversed and remanded for further proceedings beginning with the initial appearance. However, the driving-without-a-valid-license charge is modified and reduced to a minor misdemeanor and must be retried as such on remand.

Judgment accordingly.

DONOFRIO and WAITE, JJ., concur.

VUKOVICH, DONOFRIO, and WAITE, JJ., of the Seventh Appellate District, sitting by assignment.