[Cite as *State v. Martinez*, 2016-Ohio-540.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                    Court of Appeals No. L-14-1180

    Appellee                                 Trial Court No. CR0201401839

v.

Micky Martinez                              **DECISION AND JUDGMENT**

    Appellant                                Decided:  February 12, 2016

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Charles R. McDonald, Assistant Prosecuting Attorney, for appellee.

Laurel A. Kendall, for appellant.

* * * * *

**OSOWIK, J.**

{¶ 1} This is an appeal brought by appellant, Micky Martinez, from the judgment of the Lucas County Court of Common Pleas which found him guilty of felonious assault, in violation of R.C. 2903.11.  Appellant was then sentenced to serve a sentence of four years in prison.

**{¶ 2}** On May 22, 2014, the Lucas County Grand Jury indicted Martinez on one count of felonious assault, in violation of R.C. 2903.11(A)(2) and (D), a felony of the second degree. The case proceeded to a jury trial on July 22 and July 23, 2014.

**{¶ 3}** This case stems from a May 7, 2014 altercation that took place between appellant and the victim while outside the Universal Carryout on Starr Avenue in Toledo, Lucas County, Ohio.

**{¶ 4}** Sometime after 11:00 p.m., appellant and his brother-in-law, Thomas Enright, entered the store. While in the store, appellant acknowledged a person employed at the carryout identified as Mike Martin with a "head nod." They were in the store for less than two minutes. Some words were exchanged between appellant and Martin. Nevertheless, appellant purchased some juice and then left the store with his brother-in-law.

**{¶ 5}** There was a conflict of testimony as to what occurred after appellant and Enright departed.

**{¶ 6}** Thomas Enright testified that as he and appellant walked away from the store, Martin and another person identified as the victim, Rick Gingrich, came out of the store and yelled and taunted them with indiscernible words. According to Enright, the two men then came after appellant and Enright. In response, Enright and appellant turned around and went back towards the store to engage the two men who were now coming after them. When they met, Enright testified that appellant and Martin "got in fighting stances" but no punches were thrown. Enright went on to testify that appellant looked at

2.

Gingrich as if Gingrich was going to "jump" him. Appellant then began to fight with Gingrich. Martin then began swinging at Enright. After a brief scuffle and "after the guy got off me" Enright got up and realized that appellant was already across the street, leaving Enright alone with Gingrich and Martin. Enright testified that a group began to "swarm" appellant across the street at the auto repair shop. Enright joined appellant and they proceeded to walk home. A group of "three or four, maybe five people were just walking after us." Enright did not witness much of anything in the fight between appellant and Gingrich as he was engaged in his own battle with Martin.

{¶ 7} In contrast, appellant testified that as he and Enright were walking away from the store, Martin and Gingrich exited the store, at which point Martin "ripped off" his own jacket and challenged appellant to a fight. They met "halfway." When engaged, they threw "shallow punches." Appellant then testified that Gingrich entered the fray and took a swing at appellant. Appellant dodged the punch. He then stated that Gingrich went after Enright while he was engaged in his battle with Martin. Appellant hesitated to punch Gingrich. Gingrich hesitated to punch appellant. According to appellant, at this point, two people approached from behind and he then brandished the knife. Another two approached from the side. Appellant testified that "I knew that I was either going to have to take a punch from him or I was going to have to hit him with the knife." After he stabbed Gingrich, he "bobbed and weaved" his way out by swinging the knife at the crowd that was encircling. He and Enright then had a "brisk" walk to his friend's house all the while threatening the crowd that he had "friends down Parker."

3.

{¶ 8} Rick Gingrich, the victim, testified as to his recollection of the events that evening. He remembers appellant and Enright in the store and "talking back to Mike." He and Martin waited for appellant and Enright to get farther down the street before they went out to smoke cigarettes. They waited to go outside specifically to avoid any conflict with appellant and Enright. As soon as they were outside, Gingrich testified that appellant and Enright were "already hollering down the street." Appellant and Enright "came back down there." Gingrich confirmed that appellant and Martin "squared up" as if to begin to fight, but Enright tackled Martin to the ground. Gingrich then testified that when Martin was on the ground, appellant began to kick Martin in the head and ribs. Gingrich intervened. He began to "go after" appellant, but appellant pulled out a knife and Gingrich retreated behind some garbage cans that were out near the street. As he grabbed the garbage can, appellant struck him in the chest with the knife. Appellant fled and Gingrich chased him down the street when he noticed he had difficulty breathing and realized that he had been stabbed.

{¶ 9} Mike Martin testified that when appellant and Enright entered the store, appellant started "talking smack." Martin "let him get all the way down the street" before going outside to have a cigarette. Once outside, appellant and Enright turned around and came back to the store and a fight started wherein both appellant and Enright were punching Martin. Martin did not witness the knife, but stated that Gingrich became involved when "Micky and his friend" jumped him.

4.

{¶ 10} The jury found Martinez guilty of the sole count of the indictment. On August 7, 2014, the trial court sentenced Martinez to serve a term of four years in prison.

{¶ 11} Appellant filed a timely appeal and raises two assignments of error for this court to review.

{¶ 12} In his first assignment of error, appellant argues that the "decision of the trial court as to Defendant's claim of self-defense was against the manifest weight of the evidence."

{¶ 13} In this assignment of error, appellant essentially argues that his conviction for felonious assault is against the manifest weight of the evidence because he proved the affirmative defense of self-defense at trial.

{¶ 14} Appellant was convicted of felonious assault in in violation of R.C. 2903.11(A)(2) and (D); however, he does not dispute that the state proved the elements of that offense. Rather, he argues that the jury lost its way in concluding that he did not act in self-defense.

{¶ 15} This court recently addressed the issue of self-defense in *State v. Booker*, 6th Dist. Lucas No. L-10-1140, 2013-Ohio-45, ¶ 48:

> Self-defense is an affirmative defense a defendant must prove by a preponderance of the evidence. *State v. Smith*, 12th Dist. No. CA2010-05-047, 2011-Ohio-1476, ¶ 33. To establish self-defense in a case where a defendant used deadly force, "the defendant must prove: (1) he was not at fault in creating the situation giving rise to the affray; (2) he had a bona fide

belief he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was the use of deadly force; and (3) he did not violate any duty to retreat or avoid the danger." *State v. Robbins*, 58 Ohio St.2d 74, 388 N.E.2d 755 (1979), paragraph two of the syllabus. The elements of self-defense are cumulative. Thus, "[i]f the defendant fails to prove any one of these elements by a preponderance of the evidence he has failed to demonstrate that he acted in self-defense." *State v. Jackson*, 22 Ohio St.3d 281, 284, 490 N.E.2d 893 (1986). *See also State v. Williford*, 49 Ohio St.3d 247, 249, 551 N.E.2d 1279 (1990); *State v. Caudill*, 6th Dist. No. WD-07-009, 2007-Ohio-1557, ¶ 82; and *State v. Clark*, 6th Dist. No. F-10-025, 2011-Ohio-6310, ¶ 22.

**{¶ 16}** There is no dispute that appellant stabbed the victim with a knife. Appellant testified that "I knew that I was either going to have to take a punch from him or I was going to have to hit him with the knife." He also testified that the victim had no weapon before he stabbed him. He also admitted that he turned around and came back to the store to engage the victim and Martin. There was no evidence that he could not retreat from the situation before he stabbed the victim. Although he now argues that he was surrounded by a crowd, there was a conflict of testimony as to how many people appeared and when they appeared. Appellant testified that he and Enright merely engaged in a "brisk" walk while taunting the crowd after the stabbing.

6.

**{¶ 17}** The jury is charged with the duty and task of scrutinizing conflicting testimony and assessing witness credibility in an effort to determine the truth. It is well-settled that a jury is free to believe or disbelieve all, part, or none of the testimony of any witness since the jury is in a much better position than a reviewing court to view the witnesses, observe their demeanor, and assess their credibility. *State v. Booker*, 6th Dist. No. L-10-1140, 2013-Ohio-45, ¶ 49.

**{¶ 18}** The jury was also free to reach its own conclusions concerning the objective reasonableness of appellant's belief that he was in imminent danger of bodily harm. The jury was likewise free to reach its own determination as to whether appellant was at fault in creating the situation and whether he could retreat before stabbing the victim.

**{¶ 19}** In determining whether a conviction is against the manifest weight of the evidence, we are not obliged to view the evidence in a light most favorable to the state. Instead, we sit as the proverbial "thirteenth juror" and, in so doing, may disagree with "the factfinder's resolution of the conflicting testimony." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). However, in order to substitute its judgment for that of the jury, an appellate court must find that "'in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Id.* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

7.

**{¶ 20}** We cannot say the jury clearly lost its way in rejecting appellant's self-defense argument.

**{¶ 21}** The Ohio Supreme Court has held that the elements of self-defense are cumulative and, as such, each element must be established by a preponderance of the evidence before a defendant can succeed on a claim of self-defense. *State v. Jackson*, 22 Ohio St.3d 281, 490 N.E.2d 893 (1986).

**{¶ 22}** The testimony of appellant and the victim, as well as Martin and Enright, along with the physical evidence, provides competent, credible evidence upon which the jury could find appellant failed to prove by a preponderance of the evidence that he acted in self-defense.

**{¶ 23}** Therefore, appellant's first assignment of error is found not well-taken.

**{¶ 24}** Appellant's second assignment of error states "the trial court committed reversible error when it gave a jury instruction based on the use of deadly force in self-defense, when the victim did not die, and no instruction was included concerning the definition of deadly force."

**{¶ 25}** Appellant argues that the evidence at trial demonstrated that he used non-deadly force on the victim in self-defense. More specifically, appellant now argues that since the victim did not die from being stabbed with a knife, the jury should have found that the appellant used non-deadly force in his defense.

8.

**{¶ 26}** Contrary to appellant's assertion that no instruction was given, the record demonstrates that the trial court specifically instructed the jury that "deadly weapon" was defined as:

> any instrument device or thing which has two characteristics. The first characteristic is that it is capable of inflicting or causing death. The second characteristic in the alternative, either instrument, device or thing was designed or specifically adapted for use as a weapon, or it was possessed carried or used in this case as a weapon. These are questions of fact for you to determine.

**{¶ 27}** This instruction is a recitation of the statutory definition of a "deadly weapon" that is set forth in R.C. 2923.11(A). That section defines a deadly weapon as "any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon."

**{¶ 28}** The decision of whether to give a particular jury instruction lies within the trial court's discretion. *State v. Nichols,* 11th Dist. Lake No. 2005-L-017, 2006-Ohio-2934, ¶ 28. The term "abuse of discretion" connotes more than an error of law or of judgment; it implies that the trial court's attitude was unreasonable, arbitrary or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980). We cannot find that the trial court abused its discretion in giving the jury the statutory definition of a deadly weapon.

9.

{¶ 29} Appellant is urging this court to modify the statutory definition of a deadly weapon to exclude those instruments that do not in fact cause death in a given case. We decline the invitation without further comment.

{¶ 30} For the foregoing reasons, we cannot find appellant's second assignment of error to be well-taken.

{¶ 31} We therefore affirm the judgment of the Lucas County Court of Common Pleas. We order appellant to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Arlene Singer, J.                           _____
                                                          JUDGE
Thomas J. Osowik, J.

                                            _____
Stephen A. Yarbrough, J.                                  JUDGE
CONCUR.

                                            _____
                                                          JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.sconet.state.oh.us/rod/newpdf/?source=6.