[Cite as *State v. Bunkley*, 2020-Ohio-6675.]

# IN THE COURT OF APPEALS

## ELEVENTH APPELLATE DISTRICT

## LAKE COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2020-L-024** |
| JEROME L. BUNKLEY, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Lake County Court of Common Pleas, Case No. 2019 CR 000094.

Judgment: Affirmed.

*Charles E. Coulson*, Lake County Prosecutor, and *Karen A. Sheppert*, Assistant Prosecutor, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, Ohio 44077 (For Plaintiff-Appellee).

*Dennis P. Levin*, Landerbrook Corporate Center, 5910 Landerbrook Drive, Suite 200, Cleveland, Ohio 44124 (For Defendant-Appellant).

MARY JANE TRAPP, J.

{¶1} Appellant, Jerome L. Bunkley ("Mr. Bunkley"), appeals his convictions for forgery and passing bad checks following a jury trial in the Lake County Court of Common Pleas.

{¶2} Mr. Bunkley argues that (1) the state failed to present sufficient evidence to support his convictions because there was no proper evidence establishing his identity as the offender and because copies of checks admitted into evidence were not properly

authenticated; (2) the jury's verdicts were against the manifest weight of the evidence; and (3) he was denied due process of law as a result of cumulative error.

{¶3} After a careful review of the record and pertinent law, we find as follows:

{¶4} (1) The state presented direct and circumstantial evidence, which, if believed, was sufficient to establish Mr. Bunkley's identity as the person who committed the offenses of forgery and passing bad checks. Mr. Bunkley's arguments are based on an inaccurate and incomplete characterization of the witnesses' testimony.

{¶5} (2) The state presented sufficient evidence to prove that the check was "spurious" under R.C. 2913.31(A)(2) and "dishonored" under R.C. 2913.11(B). Mr. Bunkley's arguments are premised on the inadmissibility of the state's evidence. This court reviews all evidence admitted at trial in a sufficiency analysis, and Mr. Bunkley's evidentiary arguments are without merit.

{¶6} (3) Mr. Bunkley's convictions are not against the manifest weight of the evidence. Mr. Bunkley has not established that the jury clearly lost its way and created a manifest miscarriage of justice in its credibility determinations and weighing of the evidence.

{¶7} (4) Finally, since we do not find multiple instances of harmless error, the doctrine of cumulative error is inapplicable.

{¶8} Thus, we affirm the judgment of the Lake County Court of Common Pleas.

**Substantive and Procedural History**

{¶9} On October 24, 2018, Mr. Bunkley had warranty repair work performed on his vehicle at Classic BMW ("Classic"), which is a car dealership located in Willoughby Hills, Ohio. Upon completion of the repairs, the service department provided Mr. Bunkley with quotes regarding the costs of parts and labor for additional repairs.

2

{¶10} Subsequently, Classic received a phone order for some of the quoted vehicle parts. The person provided a vehicle identification number ("VIN") so that Classic could locate and retrieve the parts associated with the vehicle's make and model. The cost to purchase the parts was much less expensive without the service department's associated labor costs.

{¶11} On November 8, 2018, a man who the state alleges was Mr. Bunkley visited Classic's parts department to complete the purchase of the ordered vehicle parts. Daniel Palermo, a parts representative at Classic, assisted him. The man identified himself as "Jerome Jones," and he signed and presented a personal check drawn from US Bank in the amount of $311.19 for the purchase. Mr. Palermo stamped the back of the check with "pay to the order of Key Bank" and put it in Classic's safe.

{¶12} "Jerome Jones" provided Mr. Palermo with contact information for the creation of a new customer account. He also signed an invoice on which Mr. Palermo had written the last seven digits of the associated VIN, which Classic used as the invoice number for record-keeping purposes.

{¶13} Classic's video surveillance system recorded the interaction between Mr. Palermo and "Jerome Jones," which lasted approximately 15 to 20 minutes. According to Mr. Palermo, "Jerome Jones" was more inquisitive during the transaction than typical customers.

{¶14} A short time later, Classic's general office notified Paul Pennington, the parts manager at Classic, that Key Bank had returned the check from "Jerome Jones" because the US Bank account did not exist. Mr. Pennington obtained the invoice number relating to the transaction with "Jerome Jones." Upon searching Classic's records, he discovered that it matched the VIN associated with Mr. Bunkley's vehicle, which Classic

3

had repaired on October 24. He further noted that the service department had recommended to Mr. Bunkley some of the same parts that "Jerome Jones" later purchased.

{¶15} Mr. Pennington notified the Willoughby Hills Police Department, and Officer Randy Mullenax responded to the call. Mr. Pennington showed Officer Mullenax the invoice and returned check documentation relating to the purchase by "Jerome Jones" on November 8 and the service order relating to Mr. Bunkley's warranty repairs on October 24. Upon review, Officer Mullenax noticed that the first names of "Jerome" and the associated VINs were the same but that the last names and addresses were different.

{¶16} Mr. Pennington also showed Officer Mullenax the surveillance video recording of the November 8 transaction with "Jerome Jones." Officer Mullenax ran the VIN and plate number through the state database on his cruiser's computer and pulled up a photo of Mr. Bunkley as the registered owner. Officer Mullenax determined that it was "evident" that the video depicted Mr. Bunkley. He showed the photo to a few Classic employees, including Mr. Palermo, and they confirmed that it depicted the man who presented himself as "Jerome Jones."

{¶17} Sometime later, a man wearing a coat and hood dropped off a box at Classic's counter that contained some of the parts that "Jerome Jones" had purchased.

{¶18} The Lake County Grand Jury indicted Mr. Bunkley on one count of forgery, a fifth-degree felony, in violation of R.C. 2913.31(A)(2) (count 1), and one count of passing bad checks, a first-degree misdemeanor, in violation of R.C. 2913.11(B) (count 2). Mr. Bunkley waived his right to be present at his arraignment, and the trial court entered not guilty pleas on his behalf.

4

{¶19} Following a hearing, the trial court granted Mr. Bunkley's oral motion to represent himself and appointed stand-by counsel.

{¶20} Mr. Bunkley filed a pretrial motion to suppress evidence relating to the Classic employees' identification of him from his license photo, which the state opposed. The trial court issued a judgment entry denying Mr. Bunkley's motion on substantive and procedural grounds.

{¶21} The matter proceeded to a jury trial, where the state presented testimony from Mr. Palermo, Mr. Pennington, and Officer Mullenax, as well as the surveillance video recording, the check from "Jerome Jones," the returned check documentation, and the documents relating to the October 24 and November 8 transactions.

{¶22} On at least three instances during his testimony, Mr. Palermo identified Mr. Bunkley as the man who presented himself as "Jerome Jones" on November 8. During cross-examination, Mr. Bunkley presented Mr. Palermo with a copy of his vehicle title. Mr. Palermo testified that its last seven digits matched the invoice number for the transaction with "Jerome Jones."

{¶23} Officer Mullenax testified that in his opinion, Mr. Bunkley appeared to be the man in the surveillance video recording.

{¶24} Mr. Bunkley obtained admission of the vehicle title he presented during cross-examination but presented no witness testimony or other evidence.

{¶25} Following deliberations, the jury found Mr. Bunkley guilty of both offenses.

{¶26} The trial court held a sentencing hearing where it sentenced Mr. Bunkley to concurrent prison terms of six months on count 1 (forgery) and 90 days on count 2 (passing bad checks); ordered restitution to the victim in the amount of $85.58; and assessed court costs and the costs of prosecution against him. The trial court

5

subsequently issued judgment entries memorializing the guilty verdicts and Mr. Bunkley's sentences.

{¶27}  Mr. Bunkley filed a notice of appeal and a motion for an appeals bond.  The trial court stayed execution of his sentence during the pendency of his appeal.

{¶28}  Mr. Bunkley presents the following four assignments of error for our review:

{¶29}  "[1.] The state of [O]hio failed to present sufficient evidence to support the trial court's convictions as to the charges of forgery and/or passing bad checks inasmuch as there was no proper evidence as to the identification of appellant at trial.

{¶30}  "[2.] The state of [O]hio failed to present sufficient evidence to support the trial court's convictions inasmuch as the copies of the checks admitted into evidence as exhibits '1a' and '1b' were not properly authenticated.

{¶31}  "[3.] The verdicts of the trial court were against the manifest weight of the evidence.

{¶32}  "[4.] The Appellant was denied due process of law as a result of the cumulative errors that occurred in this case."

## Sufficiency of the Evidence

{¶33}  We review Mr. Bunkley's first and second assignments of error together, where he contends that the state did not present sufficient evidence to support his convictions.

### *Standard of Review*

{¶34}  "'[S]ufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law."  *State v. Thompkins*, 78 Ohio

St.3d 380, 386 (1997), quoting *Black's Law Dictionary* 1433 (6th Ed.1990). "In essence, sufficiency is a test of adequacy." *Id.*

{¶35} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*

{¶36} The claim of insufficient evidence raises a question of law, the resolution of which does not allow us to weigh the evidence. *State v. Lee*, 11th Dist. Lake No. 2010-L-084, 2011-Ohio-4697, ¶9, quoting *State v. Davis*, 49 Ohio App.3d 109, 113 (8th Dist.1988).

### Forgery; Passing Bad Checks

{¶37} Mr. Bunkley was convicted of forgery in violation of R.C. 2913.31(A)(2), which states that "[n]o person, with purpose to defraud, or knowing that the person is facilitating a fraud, shall do any of the following: * * * [f]orge any writing so that it purports to be genuine when it actually is spurious, or to be the act of another who did not authorize that act, or to have been executed at a time or place or with terms different from what in fact was the case, or to be a copy of an original when no such original existed[.]"

{¶38} Mr. Bunkley was also convicted of passing bad checks in violation of R.C. 2913.11(B), which states that "[n]o person, with purpose to defraud, shall issue or transfer or cause to be issued or transferred a check or other negotiable instrument, knowing that

it will be dishonored or knowing that a person has ordered or will order stop payment on the check or other negotiable instrument."

{¶39} In addition, every criminal prosecution requires proof that the person accused of the crime is the person who committed the crime. *State v. Tate*, 140 Ohio St.3d 442, 2014-Ohio-3667, ¶15. This truism is reflected in the state's constitutional burden to prove the guilt of "the accused" beyond a reasonable doubt. (Citation omitted.) *Id.* Like any fact, the state can prove the identity of the accused by circumstantial or direct evidence. (Citation omitted.) *Id.*

### *Identity*

{¶40} Mr. Bunkley first asserts that the state did not present sufficient evidence to prove his identity as the offender. Mr. Bunkley argues that there was "no affirmative testimony" that he committed the offenses.

{¶41} According to Mr. Bunkley, Mr. Palermo testified that he never had any contact with Mr. Bunkley. Rather, Mr. Palermo's "boss," who did not testify at trial, identified "Jerome Jones" to Mr. Palermo as "Jerome Bunkley."

{¶42} Mr. Bunkley misconstrues Mr. Palermo's testimony. Mr. Palermo initially testified that the man with whom he interacted on November 8 presented himself as "Jerome Bunkley." Upon being presented with the check, however, Mr. Palermo corrected his prior testimony and stated that the man actually presented himself as "Jerome Jones." He explained that he had mistakenly said "Jerome Bunkley" as a result of hearing the name "over the last few months" from his "boss," presumably during preparation for trial.

8

{¶43} Although Mr. Palermo referred only to his "boss" in this portion of his testimony, he later identified his "boss" as "Paul Pennington." As indicated, Mr. Pennington *did* testify at trial.

{¶44} Further, an appellate court must review "*all of the evidence*" admitted at trial in a sufficiency analysis. (Emphasis sic.) *Tate* at ¶18, quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Mr. Bunkley's argument does not acknowledge Mr. Palermo's other testimony, which included his multiple identifications of Mr. Bunkley in the courtroom as being "Jerome Jones" and his statement that nothing in the surveillance video presented at trial contradicted what he saw of Mr. Bunkley in the courtroom. Therefore, contrary to Mr. Bunkley's assertions, Mr. Palermo positively identified Mr. Bunkley as the offender, and he did so multiple times.

{¶45} Mr. Bunkley states that Mr. Pennington was "another Classic BMW employee" and that he testified that he was told by Mr. Palermo, who had been told by his "boss," that Mr. Bunkley was the offender.

{¶46} Mr. Pennington actually testified that he was the parts manager in charge of nine employees, not simply a Classic "employee." His and Mr. Palermo's testimony established that he was the "boss" to whom Mr. Palermo referred.

{¶47} In addition, Mr. Pennington testified he did not have contact with Mr. Bunkley on October 24 or with "Jerome Jones" on November 8, but his "parts employee," Mr. Palermo, identified the offender as Mr. Bunkley. Mr. Pennington was unable to positively identify Mr. Bunkley in the courtroom from the surveillance video.

{¶48} Instead, the crux of Mr. Pennington's testimony related to his role in personally investigating the transaction following the return of the check, where he discovered that the invoice number matched the VIN associated with Mr. Bunkley's

9

recently repaired vehicle and that Classic had previously recommended some of the purchased parts to Mr. Bunkley.

{¶49} Finally, according to Mr. Bunkley, Officer Mullenax testified that he showed Mr. Bunkley's license photo to a few "unidentified" Classic employees who positively identified Mr. Bunkley, but these employees did not testify at trial. He also asserts that Officer Mullenax's opinion that Mr. Bunkley was the man in the surveillance video was "tainted" by the employees' positive identification.

{¶50} Officer Mullenax actually testified that he viewed Mr. Bunkley's license photo and determined Mr. Bunkley was the person in the surveillance video before showing the photo to Classic employees. Mr. Palermo was one of the Classic employees to whom he showed the license photo. Officer Mullenax also testified that in his opinion, Mr. Bunkley appeared to be the man in the surveillance video recording. Whether Officer Mullenax's identification of Mr. Bunkley was "tainted" relates to the weight of his testimony, which we may not consider in our sufficiency analysis. *See Lee, supra,* at ¶9; *State v. Reed*, 10th Dist. Franklin No. 08AP-20, 2008-Ohio-6082, ¶48 ("[T]he credibility of witnesses and their degree of certainty in identification are matters affecting the weight of the evidence").

{¶51} In sum, we find that the state presented direct and circumstantial evidence, which, if believed, was sufficient to establish Mr. Bunkley's identity as the person who committed the offenses of forgery and passing bad checks.

### *Meanings of Spurious and Dishonored*

{¶52} Mr. Bunkley next contends that the state did not present sufficient evidence to establish that the check was "spurious" under R.C. 2913.31(A)(2), for the offense of forgery, or "dishonored" under R.C. 2913.11(B), for the offense of passing bad checks.

10

{¶53} Since neither term is defined by their respective statutes, we refer to their common, everyday meanings. *See Am. Fiber Sys., Inc. v. Levin*, 125 Ohio St.3d 374, 2010-Ohio-1468, ¶24. The dictionary definitions of "spurious" include "outwardly similar or corresponding to something without having its genuine qualities: FALSE" and "of falsified or erroneously attributed origin: FORGED." *See Merriam-Webster*, http://www.merriam-webster. com/dictionary/spurious (accessed December 2, 2020).

{¶54} The dictionary definition of "dishonored" includes "the nonpayment or nonacceptance of commercial paper by the party on whom it is drawn." *See Merriam-Webster*, https://www.merriam-webster.com/dictionary/dishonored (accessed December 2, 2020). In addition, "a person who issues * * * a check * * * is presumed to know that it will be dishonored" for purposes of R.C. 2913.11 "if * * * [t]he drawer had no account with the drawee at the time of issue or the stated date, whichever is later[.]" R.C. 2913.11(C)(1).

{¶55} Mr. Palermo testified that he observed "Jerome Jones" sign and present a personal check, which he stamped "pay to the order of Key Bank" and put in Classic's safe. Mr. Palermo identified exhibit 1B as the check "Jerome Jones" presented.

{¶56} Mr. Pennington identified exhibit 1A as the documents he received from Classic's general office regarding the return of "Jerome Jones'" check. Exhibit 1A consists of a document from Key Bank addressed to Classic and a copy of a check. The document indicates the return of one check totaling $311.19 from "Jerome Jones" that was deposited on November 9, 2018. Under "reason," it states "UTLA – UNABLE TO LOCATE ACCOUNT." The check copy is stamped with the following: "Return Reason E, UTLA – Unable to Locate Account."

{¶57} Mr. Bunkley argues that exhibits 1A and 1B were inadmissible at trial and, thus, insufficient to support his convictions. According to Mr. Bunkley, the state was required to present testimony from a Key Bank representative to establish that the check was "spurious" and "dishonored."

{¶58} Mr. Bunkley acknowledges that he did not object to the admission of this evidence at trial. This court has explained that "[w]hile one has the right to represent himself or herself * * *, the pro se litigant is to be treated the same as one trained in the law as far as the requirement to follow procedural law and the adherence to court rules." (Citations omitted.) *State v. Ober*, 11th Dist. Portage Nos. 2018-P-0034 & 2018-P-0035, 2019-Ohio-843, ¶12.

{¶59} In addition, when conducting a sufficiency of the evidence analysis, this court is to look at the actual evidence admitted at trial, both admissible and inadmissible. (Citations omitted.) *State v. Rose*, 11th Dist. Lake No. 2014-L-086, 2015-Ohio-2607, ¶34; see *State v. Brewer*, 121 Ohio St.3d 202, 2009-Ohio-593, ¶20.

{¶60} Therefore, to the extent Mr. Bunkley's assignment of error is dependent on the exclusion of evidence, it is without merit.

{¶61} Further, as demonstrated below, Mr. Bunkley's admissibility arguments are also without merit.

### *Authentication*

{¶62} Mr. Bunkley argues that exhibits 1A and 1B were inadmissible because they were copies and were not properly authenticated. We disagree.

{¶63} Evid.R. 901(A) states that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." As this court

has recognized, "[t]his low threshold standard does not require *conclusive* proof of authenticity, but only sufficient foundational evidence for the trier of fact to conclude that the document is what its proponent claims it to be." (Citations omitted.) *State v. Miller*, 11th Dist. Trumbull No. 2014-T-0061, 2015-Ohio-956, ¶21. "A proponent may demonstrate genuineness or authenticity through direct or circumstantial evidence." (Citations omitted.) *State v. Jaskiewicz*, 11th Dist. Trumbull No. 2012-T-0051, 2013-Ohio-4552, ¶12.

{¶64} For instance, in *State v. Shaw*, 4th Dist. Ross No. 11CA3288, 2013-Ohio-5503, the Fourth District held that a bank representative's testimony was not required to authenticate checks at trial to prove a passing bad checks offense. *Id.* at ¶8. The court found that testimony from employees who viewed the original and returned check was sufficient to satisfy the authentication requirement of Evid.R. 901(A). *Id.* at ¶9.

{¶65} In addition, this court has recognized that "[c]ommercial paper, which by definition includes bank checks and drafts, the signatures thereon, and the documents relating thereto, are self-authenticating pursuant to Evid.R. 902(9)." *State v. Doane*, 11th Dist. Trumbull No. 91-T-4639, 1994 WL 721648, *2 (Dec. 16, 1994); *State v. Carroll*, 11th Dist. Ashtabula Nos. 2017-A-0030 & 2017-A-0031, 2018-Ohio-1884, ¶43.

{¶66} Further, "[a] duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original." Evid.R. 1003; *Doane* at *3; *Carroll* at ¶43.

{¶67} Mr. Palermo identified exhibit 1B as being the check "Jerome Jones" presented to him, which he recognized from the signature he had observed and the stamp he had affixed.

13

{¶68} Mr. Pennington identified exhibit 1A as being the documents he received from Classic's general office. Mr. Pennington also identified exhibit 1B as being the original check that he subsequently received from Classic's general office.

{¶69} Thus, both exhibits were properly authenticated pursuant to Evid.R. 901(A) and were also self-authenticating pursuant to Evid.R. 902(9).

{¶70} Although exhibit 1A depicts a copy of the returned check rather than the original, Mr. Bunkley has not asserted, much less established, that there is a genuine question regarding the authenticity of the original document or that it was unfair to admit a copy instead of the original.

### Hearsay

{¶71} Mr. Bunkley also argues that exhibit 1A contains inadmissible hearsay. Again, we disagree.

{¶72} "Hearsay" is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). A "statement" includes "an oral or written assertion." Evid.R. 801(A)(1).

{¶73} The general rule is that hearsay is not admissible. *See* Evid.R. 802. There are exceptions, however, which are set forth in Evid.R. 803 and 804. The business records exception is found in Evid.R. 803(6), which provides as follows:

{¶74} "The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

{¶75} "* * *

{¶76} "Records of Regularly Conducted Activity. A memorandum, report, record, or data compilation, in any form, of acts, events, or conditions, made at or near the time

14

by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness or as provided by Rule 901(B)(10), unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term 'business' as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit."

{¶77} In addition, R.C. 1303.65, which is part of Ohio's adoption of the Uniform Commercial Code, states, in relevant part, as follows:

{¶78} "(A) The following are admissible as evidence and create a presumption of dishonor and of any notice of dishonor stated:

{¶79} "* * *

{¶80} "(2) A purported stamp or writing of the drawee, payor bank, or presenting bank on or accompanying the instrument stating that acceptance or payment has been refused unless reasons for the refusal are stated and the reasons are not consistent with dishonor;

{¶81} "(3) A book or record of the drawee, payor bank, or collecting bank, kept in the usual course of business that shows dishonor, even if there is no evidence of who made the entry." R.C. 1303.65(A)(2) and (3).

{¶82} Mr. Pennington testified that state's exhibit 1A was a document he received from Classic's general office that is kept in the usual practice of Classic's business. Since bank checks and related documents are self-authenticating, the state was not required to present testimony from Key Bank regarding its record-keeping practices. *See Carroll* at

15

¶42-43; *Doane* at *3.  According to the drafters of Evid.R. 803, "[t]he record keeper, *absent self-authenticating provisions* must testify that the records are such as are routinely kept as a part of the business and that the entrant (declarant) is under a duty to record the items contained in the record, and that the records are maintained accurately in accordance with a custom or routine."  (Emphasis added.) 1980 Staff Note to Evid.R. 803.

{¶83}  In sum, we find that the state presented sufficient evidence to prove that the check was "spurious" under R.C. 2913.31(A)(2) and "dishonored" under R.C. 2913.11(B).

{¶84}  Mr. Bunkley's first and second assignments of error are without merit.

### Manifest Weight of the Evidence

{¶85}  In his third assignment of error, Mr. Bunkley asserts that his convictions were against the manifest weight of the evidence.

### Standard of Review

{¶86}  "[W]eight of the evidence addresses the evidence's effect of inducing belief."  *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, ¶25, citing *Thompkins* at 386-87.  "In other words, a reviewing court asks whose evidence is more persuasive—the state's or the defendant's?"  *Id*.

{¶87}  "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."  *Thompkins* at 387, quoting *State v. Martin,* 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶88} "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." (Citations omitted.) *Id.* "The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Id.*, quoting *Martin* at 175.

### *Analysis*

{¶89} Mr. Bunkley asserts that his convictions were against the manifest weight of the evidence "for the same reasons" set forth in his first and second assignments of error, i.e., because the state failed to prove his identity as the offender and because exhibits 1A and 1B were not admissible. As explained above, however, Mr. Bunkley's arguments are without merit.

{¶90} Based on our review of the record, we conclude there is nothing to indicate the jury clearly lost its way or created a manifest miscarriage of justice.

{¶91} As indicated, the state's identification evidence included (1) Mr. Palermo's testimony, on multiple occasions, that Mr. Bunkley was the man who presented himself as "Jerome Jones" on November 8; and (2) Mr. Palermo's and Officer Mullenax's testimony that Mr. Bunkley was the man depicted in the surveillance video. The weight of their testimony involves matters of credibility.

{¶92} "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. "The choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." (Citations omitted.) *State v.*

17

*Awan*, 22 Ohio St.3d 120, 123 (1986). A fact finder is free to believe all, some, or none of the testimony of each witness appearing before it. (Citation omitted.) *State v. Fetty*, 11th Dist. Portage No. 2011-P-0091, 2012-Ohio-6127, ¶58. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature. (Citations omitted.) *State v. Tucker*, 10th Dist. Franklin Nos. 15AP-434 & 15AP-435, 2016-Ohio-1033, ¶13.

{¶93} Both Mr. Palermo and Officer Mullenax explained the bases of their identifications. According to Mr. Palermo, he recalled details of the 15 to 20-minute transaction because "Jerome Jones" was more inquisitive than the traditional customer. According to Officer Mullenax, the surveillance video contains "several decent profile shots" where you can see "Jerome Jones'" face.

{¶94} Mr. Bunkley had the opportunity to attack the reliability of the witnesses' identifications at trial. Plus, the jury was able to personally observe Mr. Bunkley during trial, view the surveillance video, and draw their own conclusions.

{¶95} Accordingly, we see no compelling reason to disturb the jury's credibility determinations.

{¶96} The state's identification evidence also included several pieces of circumstantial evidence connecting Mr. Bunkley to "Jerome Jones." A prerequisite for any reversal on manifest-weight grounds is conflicting evidence weighing heavily against the conviction. (Citations omitted.) *Tate*, *supra*, at ¶20. Mr. Bunkley has not asserted, much less established, that the circumstantial evidence is subject to conflicting inferences or that it is unbelievable or incredible. Therefore, we see no compelling reason to disturb the jury's determinations.

{¶97} Mr. Bunkley's third assignment of error is without merit.

## Cumulative Error

{¶98} In his fourth and final assignment of error, Mr. Bunkley contends that he was denied due process of law as a result of cumulative error.

{¶99} Under the doctrine of cumulative error, "a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal." *State v. Garner*, 74 Ohio St.3d 49, 64 (1995). In other words, if this court finds various errors to be harmless error, we may reverse based upon the effect of all of these harmless errors together. *State v. Donkers*, 170 Ohio App.3d 509, 2007-Ohio-1557, ¶202 (11th Dist.).

{¶100} The doctrine is not applicable to this case as we do not find multiple instances of harmless error. *See Garner* at 64.

{¶101} Mr. Bunkley's fourth assignment of error is without merit.

{¶102} For the foregoing reasons, the judgment of the Lake County Court of Common Pleas is affirmed.


TIMOTHY P. CANNON, P.J.,

CYNTHIA WESTCOTT RICE, J.,

concur.